[Crim. No. 6514. In Bank. June 10, 1960.]

THE PEOPLE, Respondent, v. RAYMOND L. CARTIER, Appellant.

302

Robert K. Barber, under appointment by the Supreme Court, for Appellant.

Stanley Mosk, Attorney General, and Norman H. Sokolow, Deputy Attorney General, for Respondent.

McCOMB, J.—This is an automatic appeal from a judgment of guilty of murder in the first degree after trial before the court without a jury. The trial judge fixed the punishment at death.

Viewed in the light most favorable to the People, the record discloses the following facts:

In November 1957 defendant, 29 years of age, resided with his wife, Geneva Cartier, in a single-story duplex dwelling in San Diego. Defendant and his wife had been married a few months before.

On November 11, 1957, defendant left work at approximately 3:45 p. m. and by prearrangement met his wife. They went to a bar, had a drink and made plans for Mrs. Cartier to leave her job about 7 o'clock that evening. Mrs. Cartier was then driven to her place of employment, and defendant drove home, where he changed his clothes and cut a rug in half, as requested by his wife. While at home, defendant drank one "mixed drink" and half of a second. When he had drunk about half of the second one, he added some wine to it. This drink he also consumed.

About 5:30 defendant left home and drove to a bar, where he had a few beers. At approximately 7 p. m. he met his wife at her place of employment. They immediately went to a nearby bar for a drink, but before doing so each of them drank from a bottle which defendant had brought with him. After having one drink at the bar, they left and proceeded to another bar. Between the two bars they drank the rest of the contents of the bottle which defendant had. At this

time defendant felt exceedingly happy and gave his wife the keys to their automobile. At the second bar they had two drinks, played shuffleboard, and left about 8:15 to go to another bar, the Java Café.

They arrived at the Java Café between 9 and 10 p. m. They took seats at the end of the bar and invited a waitress to have a drink with them. She accepted the offer and sat with them at the bar for approximately 45 minutes. Defendant left his wife and the waitress and went to the rest room. During his absence a sailor came into the bar with a ring which he was trying to pledge. The waitress and defendant's wife called the sailor over to show them the ring, struck a match to see it better, and in the process held the sailor's hand. Defendant was standing behind his wife while she and the waitress were looking at the ring on the sailor's finger, and defendant became very angry and violent because they were talking with the sailor. He told the sailor that if he did not take his hands off his (defendant's) wife, he would "knock his block off," and said, "If you don't get away from my wife, I will kill you." The sailor immediately turned and ran out of the bar.

Defendant's wife then tried to humor defendant back into a happy state. Thereafter defendant got into an argument with the bartender about the latter's refusal to cash a check for him. He grabbed the bartender and practically pulled him over the bar. While his wife was trying to humor defendant and quiet him, he said to her, "You won't think none of this is so funny." The waitress sitting with them testified: "[W]hen he said this, I could hear this part well, this part, 'You won't think none of this is so funny,' I heard that well because I was sitting right next to him, but it sounded like to me he said after 'won't,' 'You won't think none of this is so funny'— maybe it wasn't 'home' but it sounded like the words to me, his words dropped when he said 'h,' 'home,' like that."

Mr. Martinez, who lived with his wife and child in the other dwelling unit in the duplex occupied by the Cartiers, stated that on the evening in question he had gone to bed about 7 or 7:30 and was later awakened by the sound of violent quarreling coming from the Cartier residence and that he recognized the voices as being those of defendant and his wife. The quarreling lasted for about 15 minutes, during which time he heard a "scuffling" noise "like furniture being moved," and then he heard defendant's wife say, "Please, please, don't." He testified that there was no con-

versation after the plea by Mrs. Cartier; that he heard between "three and five thumps and they were just, well, hollow thumps, I had never heard anything like before this"; and that afterwards everything became silent and he went back to sleep.

Mr. Martinez was awakened later by a neighbor's calling "Fire!" Thereupon he arose, dressed and went outside to the front of the Cartiers' part of the duplex. There he saw defendant standing on his front porch with the front door closed behind him. Defendant was facing away from the front door and was motionless. Mr. Martinez asked defendant if Mrs. Cartier was inside, and defendant replied: "I don't know, I think she is inside."

Mr. Martinez then tried to open the front door. Finding it locked, he forced it open by kicking it. He then entered the house and found it filled with smoke and the heat quite intense. He came out of the house and walked around to the back porch of the house, but found too much smoke there to enter. He returned to the front of the house and stood with defendant beside a car.

Defendant suddenly ran into the Martinez side of the duplex. Mr. Martinez followed him and found defendant in the kitchen trying to knock down the kitchen wall with a chair. The kitchen wall was opposite the bedroom in the Cartier side of the duplex. When asked what he was doing, defendant replied that his wife was in there and that he loved her.

It was about 11:30 p.m. when the neighbor had noticed the fire. Shortly thereafter members of the fire department arrived and extinguished the fire, and the body of defendant's wife was found on the floor of the bedroom. It was lying face upward, with the head near the foot of the bed, and was covered with considerable debris, which appeared to have been bedclothes and a foam rubber mattress. Also discovered near the body were a butcher knife, a French chef's knife, and several pieces of heavy glass similar to a heavy glass ashtray. In a corner of the bedroom was found a meat cleaver. A paring knife was found on the floor beneath the shoulders of the body.

An autopsy disclosed that the body was charred over nearly the entire skin surface. Both bones of the lower right arm were fractured at a point approximately one inch above the wrist joint, and the bone fragments protruded through the flesh. A large wound extended from the collar bone on the left downward and across the midline to and including the vagina.

The wound was jagged and extended through the skin, underlying fat and muscle tissue. The cartilages of the second through the tenth ribs on the left side had been separated, and the heart had been severed from the major vessels connecting to it and removed from the body. The vagina had likewise been cut out from the surrounding tissue. On the head there was a depressed fracture, oval in shape, approximately one and a half centimeters in diameter, at a point a little above the ear. An examination of the tracheobronchial tree revealed no evidence of smoke inhalation. In the opinion of the autopsy surgeon, the death of defendant's wife was caused by the cutting out of her heart.

Two experts testified that they had inspected the Cartier home after the fire, that the area of greatest burning was located in the bedroom area at a point near the foot of the bed, where the body was found; and that the fire started at that point near the floor below the level of the bottom of the bed. They further testified that the fire was of deliberate incendiary origin.

These are the questions necessary for us to determine:

First. *Was there substantial evidence to sustain the trial court's finding that defendant committed first degree murder (a) with deliberation and premeditation and (b) while perpetrating mayhem?*

*Yes.*

(a)

These rules are here applicable:

■ (1) A homicide committed during a sudden quarrel, while the perpetrator is in the throes of violent rage, is not murder of the first degree. Such a homicide may be murder of the second degree or it may be voluntary manslaughter, dependent upon the law-invoking definitive facts to be deduced from the surrounding circumstances, including the character and extent of provocation. (See *People* v. *Valentine*, 28 Cal.2d 121, 132 [4], 137 [14] [169 P.2d 1]; *People* v. *Bender*, 27 Cal.2d 164, 179-180 [9-10a], 181-182 [14-17], 186-187 [10b] [163 P.2d 8]; *People* v. *Thomas*, 25 Cal.2d 880, 901 [16, 17], 903 [19-21] [156 P.2d 7].)

■ (2) To establish the crime of first degree murder, direct evidence of a deliberate and premeditated purpose to kill is not required. The necessary elements of deliberation and premeditation may be inferred from proof of such facts and circumstances as will furnish a reasonable founda-

tion for such an inference, and where the evidence is not in law insufficient, the matter is exclusively within the province of the trier of fact to determine. (*People* v. *Cole*, 47 Cal.2d 99, 106 [7] [301 P.2d 854, 56 A.L.R.2d 1435]; *People* v. *Caldwell*, 43 Cal.2d 864, 869 [6] [279 P.2d 539]; *People* v. *Isby*, 30 Cal.2d 879, 888 [2] [186 P.2d 405].)

(3) A murder is of the first degree regardless of how quickly the act of killing follows the ultimate formation of the intention if that intention has been reached with deliberation and premeditation. (*People* v. *Thomas, supra*, 25 Cal.2d 880, 900 [15].)

Applying the foregoing rules to the facts in the present case, the evidence discloses not only that there was quarreling upon the part of defendant and his wife but also that there was an elaborately designed and pursued killing indicative of deliberation and premeditation.

Obviously the evidence in this case admits of various and conflicting inferences both as to some basic facts and as to the ultimate law-defined operative fact. Insofar as the record reflects the evidence for consideration by this reviewing court, it is easy to suggest that the trier of fact could have found that the crime was murder of the second degree. But that is no answer to the question immediately before us. That question is not would the evidence support some other finding, but, rather, is there substantial evidence to sustain the finding which the trial court made.

The evidence discloses that defendant's face became white and contorted when he saw a sailor standing close to his wife and his wife seemingly placing her hands on the sailor's person in the Java Café. Among other things, defendant threatened to kill the sailor. His wife tried to humor him back into a happy state and put her hand on his arm.

After defendant's wife "tried to cool him down" and after the bartender agreed to cash a check for defendant, "A few minutes later he [defendant] said, 'Let's forget it, let's go home,' and . . . they didn't even cash the check. . . . They were happy when they left, they weren't laughing it up, so to speak, but they went out arm in arm together." The witness who described defendant's expressions of anger directed toward the sailor and subsequently, after defendant "simmered down from that incident," his expressions of anger directed toward the bartender, further testified: "I have not said he was angry with her [defendant's wife] at any time. I have just said he never, never once cursed her in any way

or struck her or even attempted to look like he was going to strike her. Not her, he was just mad at the things that were happening and she happened to be there and she was the one that was trying to calm him down.''

Recognition of defendant's rage in the café does not as a matter of law justify the factual conclusion *by a reviewing court* that the ensuing homicide was perpetrated as a result of or during such rage, or as an unplanned, unreasoned outburst of sudden violent anger. The evidence, viewed (as we are bound to view it) favorable to supporting the judgment, indicates that before he left the café defendant appeared to have regained his composure and to be thinking rationally and deliberately.

Consideration of the evidence of defendant's training and skill as a butcher, and his conduct subsequent to leaving the café as manifested by the condition of his wife's body, leads to the conclusion that the trier of fact from his vantage point, including observation of defendant during both direct and cross-examination, cannot be held to have been unjustified in finding that the acts of mayhem were perpetrated in carrying out a deliberately formed plan, not unpremeditatedly as a mere reflex incident in a wild and drunken rage.

Defendant admitted that during two previous marriages he had slapped his first wife a few times and had slapped his second wife ''quite a bit.''

From the evidence the trier of fact could have concluded that defendant was the aggressor throughout. It was he who became contorted with anger earlier that evening in the Java Café, and it was his wife who tried to smooth things over. It was his wife who was heard crying, ''Please, please, don't'' during the quarrel prior to the killing. It was the defendant who had relatively minor scratches on his person, whereas it was his wife whose body was found terribly mutilated with some 40 knife wounds on it and the heart and private parts virtually excised, in addition to skull and arm fractures.

The record discloses that defendant had been trained as a Navy cook, receiving training as a butcher; that just prior to the killing he passed an examination for a higher rank; and that this examination entailed a knowledge of butchering meat for use in the Navy mess. A witness who had taken the same examination testified as follows: ''Q. Well, are there questions regarding the use of knives for butchering and cutting and carving on those tests? A. Yes, there is—it doesn't show you how to exactly hold the knife or anything, but it describes

how to do your cutting and that sort. Q. Yes. Does the preparation and training, the preparation for the test include instructions on how to cut through the cartilage in the rib area in different types of animals? A. Yes, they have books on all that, yes, sir.'' Another Navy witness testified that defendant ''did all the preparing of the meals [on board ship], using of the knife, such as slicing the meat and whatever it took to prepare the meals.''

The record further shows that the body of defendant's wife contained, in addition to approximately 12 small, glancing skin incisions which did not penetrate through the entire skin, one or two small incisions which did go through the skin and a large incision which extended from approximately the midportion of the left clavicle in the upper chest down through the chest and very slightly to the right ending in the region of the genitalia in the abdomen. The incision was extended around the vagina so as to almost completely excise the vagina and had been extended so as to transect the cartilages of all the ribs on the left side, with the exception of the first one, exposing the left chest cavity. The heart, when the body was recovered, was separated from the main portion of the body, and the vagina and all the external genitalia had been, with the exception of several small strands, completely separated from the body. The heart was found lying between the right elbow and right rib cage of the body and had been covered with burning, or burned, debris.

The autopsy surgeon testified that the cuts upon the decedent's body were made with downward strokes of a knife and that there was, in addition to what is referred to as the ''larger cut'' (the opening from which the heart and vagina were removed) a smaller vertical cut which ''exactly paralleled'' the larger cut. He testified as follows: ''Q. Now, I have reference to a vertical line at this point, and can you tell us, and I am referring to a mark to the right of the right breast as we view the diagram, and to the left of the larger cut, and could you tell us if you made any findings in regard to that, as to the definite size and to the nature of that type of mark? A. Yes, sir, it was a wound *exactly paralleling* the major wound on the body. It was, I believe, the only wound that actually extended under the skin, and into the subcutaneous tissue. Q. And would that have been in the breast area as we see it here? A. Yes, sir. Q. Now, can you tell us anything in respect to these transverse cuts or cuts [*sic*], as to whether they were performed before or after the deeper vertical in-

cision? A. Yes, sir, in my opinion they occurred *before* the deep incision, because at least one, possibly two, are seen to continue right directly from one border to the opposite border of the skin flaps and in my opinion this could not readily have been done after the body had been incised or opened up, with such accuracy." (Italics added.)

The decedent's slacks which she was wearing the last time she was seen alive had been torn down the left side, as had her underwear and her blouse. Also in the room was found a pair of women's underpants, ripped and torn and with the crotch gone.

The record further shows that the knives which were found near, under, and in the same room with the body were customarily kept in the kitchen of the duplex and that the kitchen drawers where the knives were kept were open.

The autopsy surgeon testified that death was caused by the cutting out of the heart prior to the fire and that the skull fracture had been caused by a blow from a "blunt object."

From the foregoing evidence the trier of fact was justified in drawing an inference that defendant had inflicted the more superficial cuts which exactly paralleled the deeper or larger cut in an attempt to ascertain the proper location to carry out his intention to murder his wife by cutting out her heart and vagina.

The trier of fact could reasonably have drawn an inference from the record that defendant and his wife had had an argument; that thereafter defendant decided to kill his wife; that he then hit her over the head with some blunt instrument, procured the knives from the drawers in the kitchen of the duplex, brought them into the room where his wife's body was found, and, pursuant to his butchering training, made the superficial cuts on her body locating the vital spots of her heart and vagina; and that thereafter he murdered her by severing these organs from her body.

From the evidence the trier of fact was amply warranted in drawing the inference that defendant deliberately and with premeditation murdered his wife.

The record supports the inference that the manner in which defendant accomplished his purpose was the result of premeditation and not of hasty, rash impulse; that defendant conceived the idea of cutting out his wife's heart and vagina in the course of thoughtful planning, not impetuously; and that he deliberately concentrated on locations and means to

accomplish his intent to kill her in the particular way which he used.

*People* v. *Bender,* 27 Cal.2d 164 [163 P.2d 8], relied on by defendant, is clearly distinguishable upon its facts from the present case. In the Bender case the evidence tended only to show that defendant killed his wife while she was intoxicated. There was no substantial evidence casting any light upon his intent. The statements and testimony of the defendant tended to show that there had been months of disagreement between the parties, culminating in murder after several hours of drunken quarreling. However, the record left to pure conjecture the conclusion that the defendant arrived at the intent to kill as a result of deliberation and premeditation.

*People* v. *Hopper,* 145 Cal.App.2d 180 [302 P.2d 94], also relied on by defendant, is distinguishable from the facts in the present case. In the cited case there is not seen the calculated type of killing we find in this case. The victim in People v. Hopper met her death by being kicked to death. Defendant here first made a minor cut on his wife's body in an attempt to ascertain where to cut her in order to be sure to cut out her heart and vagina. The record also discloses that it was necessary for him to go to the kitchen and open several drawers in order to obtain the knives he needed to carry out his nefarious purpose.

As pointed out in the instant case, there was not only evidence of quarreling on the part of defendant and his wife but evidence of an elaborately designed and pursued killing indicative of deliberation and premeditation.

### (b)

All murder which is committed in the perpetration of mayhem is murder of the first degree. (Pen. Code, § 189.) ▉ It is mayhem if the injury inflicted deprives the person injured of a member of his body or the usual uses of the severed organ. (Pen. Code, § 203; *Phillips* v. *State,* 140 Tex. Crim. 84 [143 S.W.2d 591, 592]; 57 C.J.S. (1948) Mayhem, § 3, p. 465.)

▉ Likewise, the long established rule, recently reaffirmed by this court in *People* v. *Mason, ante,* pp. 164, 169 [4] [4 Cal.Rptr. 841, 351 P.2d 1025], is here applicable, that a homicide is committed in the perpetration of a felony when the killing and felony are parts of one continuous transaction. (See also *People* v. *Chavez,* 37 Cal.2d 656, 669 [10]-[11] [235 P.2d 632]; *People* v. *Boss,* 210 Cal. 245, 252 [5] [290 P. 881].)

From the evidence set forth above, the trier of fact was justified in drawing the inference that defendant had murdered his wife while perpetrating the crime of mayhem, to wit, severing the vagina and the external genitalia from her body and cutting out her heart.

For either of the foregoing reasons the record discloses that defendant was guilty of murder in the first degree.

■ Second. *Did the trial court err in receiving in evidence the testimony of Mrs. Crawford relative to seeing defendant's wife run onto her porch on an occasion six weeks prior to her death and to seeing defendant come out after her and pull her back into the house?*

*No.* This testimony was admitted over objection that it was immaterial and too remote in point of time. Evidence tending to establish prior quarrels between a defendant and decedent and the making of threats by the former is properly admitted and is competent to show the motive and state of mind of the defendant. The objection that the evidence is too remote goes to its weight rather than to its admissibility. (*People* v. *Granados,* 49 Cal.2d 490, 494 [2] [319 P.2d 346]; *People* v. *De Moss,* 4 Cal.2d 469, 474 [4] [50 P.2d 1031]; *People* v. *Chaves,* 122 Cal. 134, 143 [54 P. 596]; *People* v. *Wilson,* 23 Cal.App. 513, 521 [138 P. 971].)

■ Third. *Did the trial judge err in applying the law in fixing the penalty?*

*No.* In announcing the penalty the trial judge made the following statement: "If I were to be governed by my personal desires and my feelings and my sentiments I would extend to him clemency and mercy and plead for him forgiveness for his crimes at the hands of Almighty God, but when I took an oath to enforce the law, I, as a Judge, undertook a certain duty to the public, to the community at large, which duty I am now called upon to perform. . . . While there is no restriction that the law places upon the trier of fact, the law simply says to him he shall affix the proper penalty, and customarily in a first degree murder case in this state the trier of fact is not justified in giving the lesser penalty in the absence of some mitigating circumstance or circumstances. Whether the death penalty is a deterrent to crime, I don't suppose I know or anyone else knows, but the theory is that society is justified in a murder case of exacting the death penalty where there is nothing to mitigate the offense. With these thoughts in mind, I have examined the evidence in this

case. I am mindful of the defendant's previous good record ... but the homicide here is so terrible I can find nothing to mitigate it. Oh, I suppose I could assume the position that 'Well, this man had one drink too many, therefore he should not receive the death sentence,' but if I were to do that, I wouldn't be fair to the public because nowadays a great number of defendants ... say, 'Your Honor, we did what we did only because we had a drink,' and the law is that voluntary intoxication is no defense. Of course, in a case like this, if a man has too much to drink, then he can't, of course, have the requisite intent to commit murder, but I found against this defendant on that phase of the case. . . . So, gentlemen, I, with a great personal reluctance must conclude that the only penalty that I can in justice assess this defendant is the extreme penalty. . . . ''

Again, after defendant had withdrawn his plea of not guilty by reason of insanity, the judge said, ''[W]ere I left to my personal feelings, I wouldn't give him the death penalty, but I felt I had to do it in the performance of my duty. . . .''

Defendant contends that the trial court imposed the extreme penalty under a misconception of the law, to wit, that he believed that such penalty must be imposed unless mitigating circumstances were found.

Rather, the judge correctly said that ''there is no restriction that the *law* places upon the trier of fact'' (italics added). (Pen. Code, § 190; *People* v. *Green,* 47 Cal.2d 209, 229, 232 [302 P.2d 307]; *People* v. *Friend,* 47 Cal.2d 749, 764 [11] [306 P.2d 463].) But he further said, ''[*C*]*ustomarily* in a first degree murder case in this state the trier of fact is not justified in giving the lesser penalty in the absence of some mitigating circumstance,'' and that ''[T]he *theory* is that society is justified in a murder case of exacting the death penalty where there is nothing to mitigate the offense'' (italics added).

Viewing the judge's discussion as a whole, it does not appear that he improperly considered himself bound by this asserted (and dubious) custom or theory. Nor does his statement that ''the homicide here is so terrible I can find nothing to mitigate it,'' in the light of his entire remarks, establish a misconception that in the absence of mitigating circumstances he was required to impose the extreme penalty; rather it indicates that, as he could properly do (*People* v. *Friend, supra,* p. 767 of 47 Cal.2d), he considered the apparent barbarity of the manner and means of the homicide (just as he considered defend-

ant's previous good record, his intoxication, and the interests of society) in making the choice of penalty.

The judge's statements further clearly show that he conscientiously selected the penalty in his capacity as the officer of the People charged with that power and duty, and that his express refusal to act in accord with his "personal desires" and "personal feelings" was not the result of a mistaken belief that his discretion was less than absolute but of a proper regard for his judicial position in exercising that discretion. The rule is applicable to the facts of the present case that where a judge's statements as a whole disclose a correct concept of the law and its application, no secondary remarks should be deemed to have impeached his determination. (*People* v. *Borchers,* 50 Cal.2d 321, 329 [8] et seq. [325 P.2d 97].)

The judgment is affirmed.

Gibson, C. J., Traynor, J., Schauer, J., Peters, J., White, J., and Dooling, J., concurred.

Appellant's petition for a rehearing was denied July 6, 1960.