STATE OF NEBRASKA, APPELLEE, V. WILLIAM WOUNDED ARROW, APPELLANT.

480 N.W.2d 205

Filed February 21, 1992.   No. S-90-1210.

Michael T. Varn for appellant.

Don Stenberg, Attorney General, and Delores Coe-Barbee for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

CAPORALE, J.

Pursuant to an agreement whereunder the plaintiff-appellee, State of Nebraska, dismissed its use of a weapon in the commission of a felony charge and reduced its first degree murder charge to one of second degree murder, the defendant-appellant, William Wounded Arrow, pled no contest to the amended murder charge and was thereupon so adjudged and later sentenced to life imprisonment. The defendant urges the district court erred by (1) considering improper factors in determining the sentence and (2) imposing an excessive sentence. We affirm.

The defendant and the victim, Donna Wounded Arrow, were married and produced a son, who is now approximately 3 years old. The couple separated in the spring of 1990, and in April of

that year the victim filed a petition for dissolution of the marriage. That action was pending at the time the events described below took place.

During the evening of May 29 and the early morning hours of May 30, 1990, the defendant and the victim were cruising the streets of Gordon in separate vehicles. The victim had been drinking and was alone in her own vehicle. The defendant was a passenger in an automobile he owned, which was being driven by his niece, Gwendolyn Hollow Horn. According to Hollow Horn, the defendant had asked her to go along with him because he was going to finally "catch [the victim] in the act with Jim," referring to Officer Jim Demicell of the Gordon Police Department. The defendant was convinced that Demicell and the victim were having an affair, a claim Demicell denied. Hollow Horn drove because the defendant had been drinking.

Bobbie Schott was also driving his truck around Gordon that night, accompanied by Amy White, the victim's niece, and Sheldon Ballinger. The victim had told them she was having problems with the defendant; he would not leave her alone, and, apparently, they had argued earlier that evening. The three agreed to watch out for her and to keep an eye out for the defendant.

At approximately 12:50 a.m. on May 30, 1990, Demicell, who was monitoring the Gordon streets in a patrol vehicle, noticed an automobile stopped at a stop sign with its headlights turned off. He pulled up alongside the vehicle and rolled down his window, at which time he recognized the victim as the driver. Demicell told the victim to turn on her lights, which she did, and Demicell then drove away. The defendant saw this encounter and made statements to the effect that he had finally caught them.

A short time later, while the victim was stopped at a stoplight, Hollow Horn pulled the vehicle alongside that of the victim, and the defendant stated, " 'Thats adultry [sic] dear.' " The parties then apparently went their separate ways, but from that encounter on, the defendant appears to have become quite disturbed and kept making statements to the effect that the victim must think he was stupid that she would do something

right in front of him and think she could get away with it. The defendant told Hollow Horn to find the victim so that he could ask her what she was "trying to pull."

Shortly thereafter, apparently by coincidence, just as Hollow Horn had stopped the defendant's automobile at the stop sign of an intersection, the victim, traveling in the same direction, stopped her automobile close behind that of the defendant. The defendant told Hollow Horn that he was going to get into the victim's automobile, at which time he left his automobile and headed toward the victim's. At about the same time, someone in the Schott truck noticed the defendant heading toward the victim. Schott thereupon drove to the intersection and pulled his truck behind the victim's automobile.

The occupants of the Schott truck stated they saw the defendant seated in the front passenger side of the victim's automobile. The three witnesses described what followed in various ways, but in summary stated that the defendant grabbed the victim around the neck or the shoulder with his left arm, after which a struggle ensued. White saw the defendant's right hand come down in a striking motion on the victim's neck. White also reported seeing a glint of something in the defendant's hand during the struggle, but could not identify the object. After being struck, the victim got out of her automobile, staggered toward the Schott truck, and, bleeding from wounds to her neck, collapsed on the ground. Ballinger and Schott put her in the back of the truck and took her to a hospital, where she was pronounced dead on arrival.

Hollow Horn, who had also seen the struggle and had watched the victim get out of her vehicle, approached the vehicle and found the defendant still seated in the passenger seat. He had a cut on the left side of his throat and was bloody. Hollow Horn went to get the defendant's sister, and an ambulance was called. When Hollow Horn returned to the scene, the defendant asked for some paper. He then wrote a note reciting that he had caught the victim and Demicell in their affair, and as they now could not deny it, he "cut her." The defendant was subsequently transported to the hospital.

Upon a search of the crime scene, investigators discovered a folded and bloodied Buck knife on the floor of the victim's

automobile. A search of the defendant's clothing at the hospital revealed another folding knife, which was also bloodied.

An autopsy revealed that the victim's throat had been cut at least three times. One incision ran $6^{1}/_{2}$ inches across the front of the neck, severing all the major blood vessels.

Second degree murder is punishable by imprisonment for a period of from 10 years to life. Neb. Rev. Stat. §§ 28-105 and 28-304 (Reissue 1989). First degree murder is punishable by either life imprisonment or death. Neb. Rev. Stat. § 28-303 (Reissue 1989); § 28-105. The use of a weapon in the commission of a felony is punishable by imprisonment for a period of from 1 to 25 years, a $25,000 fine, or both such imprisonment and fine. Any sentence imposed for this offense must be consecutive to any other sentence imposed for the underlying crime. Neb. Rev. Stat. § 28-1205 (Reissue 1989); § 28-105. Thus, by accepting the State's plea bargain, the defendant foreclosed the possibility of being sentenced to death and of confronting a prison sentence of up to 25 years to be served consecutively to any sentence imposed for the murder.

The defendant first asserts that in imposing its sentence, the district court erroneously applied the provisions of Neb. Rev. Stat. § 29-2523 (Reissue 1989), which defines the aggravating and certain of the mitigating circumstances to be considered in sentencing first degree murderers.

As a point of reference, it is noted that § 29-2523 lists the following mitigating circumstances: the lack of prior criminal activity by the defendant, whether the defendant was under unusual pressures or influences or domination by a third person, whether the defendant had extreme mental or emotional disturbance, the defendant's age, whether the defendant was an accomplice and his participation was insignificant, whether the victim was a participant or consented to the defendant's conduct, and whether the defendant's capacity to appreciate the wrongfulness of his conduct, at the time of the crime, was impaired due to mental illness, mental defect, or alcohol.

In sentencing the defendant, the district court observed:

> The Court shouldn't just automatically impose a maximum sentence, otherwise there wouldn't be any

reason to consider any mitigating factors, and the Supreme Court justly has said to consider mitigating factors. But to say, that this case, this event, this murder was a result of mishandling a situation, does a terrible disservice to the English language. While it is not directly comparable, the Legislature has laid out a set of aggravating and mitigating factors that a Court is to follow in cases where it has to decide whether or not to impose the death penalty. That is not happening in this case, but this is a time when some of these aspects have to be considered when imposing a life sentence, which is a maximum . . . .

. . . Suffice it to say, that as far as the factors under 29-2523 mitigating factors apply here, none of them would apply if I was considering a sentence of death. So, at least, as far as that takes us, the Legislature isn't telling me in some indirect way to impose less than a maximum sentence here. But it has set out four mitigating circumstances in other situations . . . .

The district court then proceeded to examine any possible mitigating factors present, for example, consideration of the defendant's past criminal record, whether he had been under any unusual pressure, whether he was under the domination of another person, and his intelligence, education, life experiences, and mentality.

Thus, it is obvious that although the district court referred to § 29-2523, it did not rigidly apply its provisions but merely used the mitigating circumstances outlined in the section as a guide in discussing the mitigating factors present here. Indeed, the district court considered the very factors *State v. True*, 236 Neb. 274, 460 N.W.2d 668 (1990), states should be considered in sentencing one for second degree murder: the accused's age, mentality, education, experience, social and cultural background, past criminal record, and motivation for the offense, and the nature of the offense.

Where the record as a whole discloses that the sentencing court correctly understood and applied the law, extraneous remarks do not impeach the court's determination. See, e.g., *People v. Beasley*, 5 Cal. App. 3d 617, 85 Cal. Rptr. 501 (1970)

(Sims, J., dissenting); *People v. Cartier*, 54 Cal. 2d 300, 353 P.2d 53, 5 Cal. Rptr. 573 (1960). As further noted in *State v. Dean*, 237 Neb. 65, 464 N.W.2d 782 (1991), in considering a sentence to be imposed, the sentencing court is not limited in its discretion to any mathematically applied set of factors. The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life.

The defendant's second contention is that life imprisonment is excessive. As we repeatedly state, a sentence imposed within statutory limits will not be set aside absent an abuse of discretion on the part of the sentencing judge. *State v. Dethlefs*, 239 Neb. 943, 479 N.W.2d 780 (1992). Moreover, the seriousness of the offense and the amount of violence used in the commission of a crime are important factors in determining the appropriateness of a sentence. See, e.g., *State v. Nelson*, 235 Neb. 15, 453 N.W.2d 454 (1990).

Here, the defendant murdered his wife in accordance with a premeditated plan. Notwithstanding the fact that the defendant has no other serious crime of violence in his past, it cannot be said that the sentence imposed constitutes an abuse of discretion.

The record sustaining neither of the defendant's assigned errors, the judgment of the district court is affirmed.

AFFIRMED.