Filed 7/22/22Valerie H. v. Robert M. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| VALERIE H., | D078863 |
| Appellant, | |
| v. | (Super. Ct. No. 18FDV03916N) |
| ROBERT M., | |
| Respondent. | |

APPEAL from an order of the Superior Court of San Diego County, Sharon L. Kalemkiarian, Judge. Affirmed.

Cage & Miles and John T. Sylvester for Appellant.

Agape Law Firm and Sarah Redparth for Respondent.

The applicable standard of review affects virtually every appellate case and has been described as "the compass that guides the appellate court to its decision. It defines and limits the course the court follows in arriving at its destination." (*People v. Jackson* (2005) 128 Cal.App.4th 1009, 1018.) In some instances, it can be dispositive. This is one of those cases.

Valerie H. appeals from an order denying her request to renew a domestic violence restraining order (DVRO) against Robert M., her former spouse. She contends (1) the court applied an incorrect legal standard by requiring her to prove a probability of future physical violence; and (2) as a matter of law on this record, the court was required to renew the restraining order.

Applying de novo review on the first issue, we agree with Valerie[1] that one sentence in the seven-page statement of decision seemingly misstates the legal standard. But as we explain, we evaluate the legal principles applied by the trial court only after assessing the judge's discussion of the applicable law *as a whole*. Here, the court's comments about the law during trial—in issuing an oral tentative decision and elsewhere in the written statement of decision—are consistently correct. The record as a whole convincingly establishes that the trial court applied the right legal standard.

Having employed the correct legal rules, the only remaining question is whether the evidence compelled a finding in Valerie's favor as a matter of law. This standard of review—exceedingly deferential to the trial court— creates an insurmountable burden for Valerie. As a factual matter, the trial court candidly acknowledged that this was a "close" case. Other judges might have decided it differently. But as a reviewing court, our role is limited to ensuring that the trial court got the law right and that there was enough evidence to reasonably support its ultimate conclusion. Because both occurred here, we affirm.

---

[1] For clarity, we refer to the parties by first names.

## FACTUAL AND PROCEDURAL BACKGROUND

Valerie and Robert married in 2011. They have an eight-year-old child (Son), and Valerie also has an 11-year old daughter from a prior relationship.

### A. *The 2018 DVRO*

In August 2018, Valerie filed a request for a DVRO against Robert. She claimed that earlier that day Robert became "enraged" and in a struggle over car keys, he grabbed her from behind, lifted her off the ground and was "flinging [her] around" in the presence of both children.[2] She described a "history of abuse" including "an incident [in 2013] when Robert was arrested for domestic violence after he pinned [her] to the bathroom wall by [her] throat while threatening to kill [her] by slitting [her] throat."

The court issued a temporary restraining order and scheduled a hearing. Robert disputed Valerie's account of the incident. After a hearing in which both testified, the court (Judge Powazek) found "portions" of Valerie's testimony were "different from her pleadings," concluding that she "initiated the arguments, and [Robert] reacted." But the court also disbelieved Robert's testimony that no touching occurred. A restraining order was entered protecting Valerie and the children. The court allowed Robert unsupervised weekend visitation with Son.

As the DVRO approached its January 2019 expiration, Valerie asked that it be extended for two years. She asserted that Robert had not only repeatedly violated the DVRO, but also was now a "member and follower" of a "black supremacist[ ]" group, Black Hebrew Israelite. Valerie maintained that he embraced a "racist, misogynist" world view in which "blond hair is

---

[2]    Robert is described as being 6'2" tall and weighing 200 pounds. We searched the record but were unable to find a physical description of Valerie.

3

unclean" and "a woman must submit to her husband."[3]  She also claimed that he was "attempting to indoctrinate" Son into this "hateful group" and "continuously discusses his hatred of white people and woman [*sic*] with [Son]."[4]  The court extended the DVRO for two years.

B.    *The Request for An Order Renewing the DVRO*

As the new (2021) expiration date was approaching, Valerie asked the court to make the DVRO permanent as to herself and extend another five years for the children.  She alleged that Robert had repeatedly violated the DVRO by seeing Son at his school, giving her gifts, and sending "countless harassing messages" to her on Talking Parents.[5]

At the hearing, Valerie testified about a history of physical violence.  This included the 2018 incident that led to the original DVRO, as well as an episode in 2013 where Robert was arrested after allegedly striking and threatening to kill her.[6]  More recently, she testified, Robert violated rules established for exchanging physical custody of Son for visitation.  In one instance, he blocked her exit from a parking lot stating, " 'Let me see my

---

[3]    In his testimony in this case, Robert explained that in the ancient world blond hair was a symptom of having the plague and, therefore, his comment that someone with blond hair was "unclean" was not racist when placed in context of the Hebrew scriptures.

[4]    In a March 2019 discovery motion, Robert denied affiliation with Black Hebrew Israelite and stated he was a "Messianic Jew" who "follows the Laws of Moses" and "believes in Jesus."

[5]    Talking Parents is an online coparenting communication tool. (See *Melissa G. v. Raymond M.* (2018) 27 Cal.App.5th 360, 364.)

[6]    The police report tells a somewhat different story—that Valerie slapped Robert repeatedly and he "did not strangle" her.  Robert testified he was in custody less than a day and no charges were filed.

4

son.' " Jacqueline C., who supervises the exchanges, testified that about 30 percent of the time Robert does not comply with a rule that he park at least one row away from Valerie. And about half the time, he violates the rule prohibiting contact by yelling to Valerie or her daughter from across the parking lot.

At trial, Valerie's lawyer emphasized still other concerns, stating the "claim for the renewal is focused primarily" on Robert's misogyny. According to Valerie, Robert believes African Americans are "true Israelites" and everyone else is "destined for Hell." He referred to Valerie as "Jezebel" and repeatedly sent her Bible passages stating women should be submissive to men.[7]

On cross-examination, Valerie clarified that Robert was not arrested in connection with the 2018 incident, and she sustained only a "small pimple-like mark" on her finger in the struggle. She also conceded the children were not physically harmed.

Valerie has not called the police about Robert since the DVRO was first issued. And although the order allows her to record any violations of the restraining order, she offered none in evidence. Valerie conceded that since the DVRO first issued, Robert has not physically harmed her, nor has he come to her work, contacted her on social media, or sent her mail.

Robert's testimony focused on explaining his religious beliefs. He characterized himself as an "orthodox Jew" who "believe[s] in the Old Testament" and also that "Christ is the Messiah . . . ." He denied being a member of Black Hebrew Israelites, and instead claimed affiliation with Israel United in Christ Church, which he claims "teach[es] "against"

---

[7]    Robert concedes calling Valerie "Jezebel," but maintains he intended that only to denote her as one who "go[es] against the teachings" of God.

misogyny. Robert believes women are equal to men "career wise." But in marriage, he believes a wife should " 'submit to her husband' " based on certain passages in the Bible.

Not surprisingly, questions about Robert's religious beliefs created tension palpable even from the pages of a cold record. Obviously sensing this, at the end of the day the court commented:

> "I want to make something very clear because I don't want there to be any misunderstanding. Religious beliefs alone are not going to be the basis for a restraining order. There are all kinds of people that have religious beliefs that are very different from yours, from mine, from everyone else's . . . . [¶]
>
> "The evaluation I have to make in any situation is whether one's beliefs . . . give rise, as I think that's the case that Valerie is trying to make, that she has a reasonable apprehension of fear as to how Robert is going to behave in regards to the children or as to her, or whether he's going to disturb her peace . . . . [¶]
>
> "The existence of the belief in and of itself . . . doesn't necessarily lead to a finding of domestic violence, but it's not irrelevant if it relates to how someone behaves."

C.   *The Tentative Ruling*

After closing arguments, the court denied Valerie's request to renew the DVRO. Finding Robert's testimony that he had benefitted from counseling to be "credible," the court concluded, "I don't believe that there's a reasonable apprehension that [Robert] will physically harm or assault [Valerie]."

Turning to claims that Robert was disturbing Valerie's peace, the court again credited Robert's testimony that he has "been in counseling" and "has learned something." The judge acknowledged that Robert's gift-giving was

"on the edge" and irritates Valerie, but concluded it did not "rise to an apprehension of harm that's reasonable."

The court characterized Robert's religious beliefs as "unusual," but recognized there are "many people, including Orthodox Jews all over the world who share th[ose] beliefs . . . about women." Elaborating, the court stated:

> "If they were being exercised to keep women enslaved, to keep women in a position of subservience in the family, to keep women locked in the house, there one would be crossing the line. But there's nothing in [Robert's] behavior and belief, as he's expressed it, which leads me to think . . . that's what she's apprehensive about. [¶]

> "Now, I do think the quoting of the Bible verses . . . come close to disturbing her peace. I took some time to think about that because she's asked him to stop. But the Bible verse exchanges are related to his comments about the parenting of the children because I looked at them back and forth. [¶] . . . [¶]

> "The one that gives me the most concern is the one from 12/25, which is very long . . . . I think that still does not give rise to a reasonable apprehension of harm or reasonable apprehension that he will disturb her peace."

D. *The Statement of Decision*

Immediately after the oral decision, Valerie's attorney requested a statement of decision. That led to the court deeming its oral ruling a "tentative, technically." About two weeks later, a proposed statement of decision was filed, and later a statement of decision.[8]

---

8    Valerie's attorney timely filed objections to the proposed statement of decision; however, the court never saw them. The trial was conducted remotely during the COVID-19 pandemic, which may account for that. In any event, Robert does not invoke the doctrine of implied findings or claim forfeiture by a failure to object. Accordingly, the point is moot.

In the statement of decision, the court determined that Robert's "beliefs or behavior" were not influenced by a misogynistic worldview that puts Valerie or the children at risk. Although Robert's views of "how a woman moves in the world" are "not 'modern,' " the court nevertheless determined "these beliefs in and of themselves are not a basis for a protective order." Robert had not "acted in a way that restrained" Valerie "from moving in the world, advancing her career, or wearing what she wanted." To the contrary, Robert "supported her during the marriage as she completed her medical degree and earned her M.D." and he "cared for the children during the day so that she could complete her studies, and celebrated her accomplishments."

While recognizing that Robert's use of the term " 'Jezebel' " was "insulting" and "harassing," the court found that it was not "abusive." Similarly, the court noted that Robert's "traditional beliefs" may be "extremely irritating," but were "not a reason to issue a protective order." And although "concerned" about 300 messages Robert sent Valerie through Talking Parents, they spanned a two-year period and "when broken down by week" were "not harassing in volume." The court found that Robert was "judgmental in his messages, in the sense that he tried to correct what he sees as [Valerie's] incorrect thinking about scripture and parenting," but that did not constitute "domestic violence." On conflicting evidence, the court found that Robert stopped sending messages after Valerie's second request that he cease.

The court found Robert "testified credibly" about attending counseling since 2018 "and had learned from that therapy to be a better father and a better partner." The court concluded:

8

"While [Robert's] religious beliefs may be unusual, and his particular branch of Judaism not one well known to most people, the question the Court had to consider is whether those beliefs alone give rise to a 'genuine and reasonable' fear on the part of [Valerie] that there will be a disturbing of her peace in the future."

## DISCUSSION

A. *The Court Applied the Correct Legal Standard*

The Domestic Violence Prevention Act (Act) is designed "to prevent acts of domestic violence, abuse, and sexual abuse and to provide for a separation of the persons involved in the domestic violence for a period sufficient to enable these persons to seek a resolution of the causes of the violence." (Fam. Code,[9] § 6220.) Abuse "is not limited to the actual infliction of physical injury or assault" but also includes placing a person in "reasonable apprehension of imminent serious bodily injury" and engaging in behavior that harasses or "disturb[s] the peace of the other party . . . ." (§§ 6203, 6320.) Under the Act, the court "may issue an order 'to restrain any person for the purpose of preventing a recurrence of domestic violence and ensuring a period of separation of the persons involved' upon 'reasonable proof of a past act or acts of abuse.' " (*Nevarez v. Tonna* (2014) 227 Cal.App.4th 774, 782; § 6300, subd. (a).)

An initial restraining order may be "renewed, upon the request of a party, either for five years or permanently, without a showing of further abuse since the issuance of the original order . . . ." (§ 6345, subd. (a).) To support renewal, the court must find "by a preponderance of the evidence

---

[9]     Undesignated statutory references are to the Family Code.

9

that the protected party entertains a 'reasonable apprehension' of future abuse." (*Ritchie v. Konrad* (2004) 115 Cal.App.4th 1275, 1290 (*Ritchie*).)[10]

In applying this standard, the trial judge should consider the findings that led to the initial DVRO.[11] (*Ashby v. Ashby* (2021) 68 Cal.App.5th 491, 510.) " 'Also potentially relevant are any significant changes in the circumstances surrounding the events justifying the initial protective order. For instance, have the restrained and protected parties moved on with their lives so far that the opportunity and likelihood of future abuse has diminished to the degree they no longer support a renewal of the order? Or have there been no significant changes or even perhaps changes that enhance the opportunity and possibility of future abuse?' " (*Id.* at p. 511.)

In this case, the first page of the statement of decision quotes *Ritchie*, *supra*, 115 Cal.App.4th 1275 for the applicable legal standard—that is, whether the evidence demonstrated "there is a sufficient risk of future abuse to find the protected party's apprehension is genuine and reasonable." And once more, immediately before analyzing Valerie's claim, the court again correctly stated the issue is "whether [Valerie] met her burden by a preponderance of the evidence to show a 'genuine and reasonable' apprehension of future abuse."

---

[10] Without citing authority, Robert's brief incorrectly asserts the "requisite" standard of proof is "clear and convincing" evidence.

[11] In opposing a request for renewal, the restrained party cannot challenge the truth of that evidence or validity of such findings. (*In re Marriage of Brubaker & Strum* (2021) 73 Cal.App.5th 525, 537.)

Under *Ritchie*, a protected party seeking renewal is not required to prove that future violence is more likely than not to occur. Rather, the risk of future abuse need only be such that the party's apprehension or fear be genuine and reasonable. (*Ritchie, supra*, 115 Cal.App.4th at p. 1290.)

Here, despite correctly summarizing the *Ritchie* standard early in the statement of decision, a few pages later the trial court stated:

> "The Court does not find that [Valerie] met her burden to show a reasonable apprehension that 'it is more probable than not' that there is a risk physical violence will recur."

Based on this, Valerie contends the trial court applied an incorrect legal standard by requiring her to prove Robert is likely engage in physical violence unless the DVRO was renewed.

We agree with Valerie that this sentence is problematic. It has the correct *Ritchie* elements: "more probable than not," "reasonable apprehension" and "risk of future abuse." But given the way they are strung together in the sentence, the most natural reading is that "more probable than not" modifies "risk." In other words, the court seems to be stating that the DVRO should be renewed only if Valerie established she reasonably believed there was a 51 percent or more risk that Robert would engage in physical violence absent renewal of the DVRO. But whether phrased in terms of a court finding or a protected party's reasonable belief, there is no requirement that the risk of future physical abuse be greater than 50 percent. (See *Ritchie, supra*, 115 Cal.App.4th at 1290 ["So there should be no misunderstanding, this does not mean the court must find it is more likely than not future abuse will occur if the protective order is not renewed."].)

Thus, the crux of this appeal is whether the court applied the right or wrong legal standard where the statement of decision seemingly recites *both*.

11

Was the sentence Valerie focuses on just a slip of the pen?  Or does it betray faulty thinking?

Like we would do when interpreting any other type of writing, we look to the document as a whole as the surest guide to its meaning.  (See *Chin v. Namvar* (2008) 166 Cal.App.4th 994, 1009.)  On *page one* the court cites and correctly quotes the controlling *Ritchie* standard.  It does so three more times:

- "The Court finds that as to [the children], [Valerie] has not met her burden to show a reasonable apprehension of future abuse by a preponderance of the evidence."

- "The findings as to [Valerie] were a 'closer call' for this Court, as to the question of whether [she] met her burden by a preponderance of the evidence to show a 'genuine and reasonable' apprehension of future abuse."

- "[Robert] answered questions to the court's satisfaction to indicated that he is not a racist, and that his beliefs about women do not create a reasonable apprehension of risk by [Valerie]."

To interpret an ambiguity in the statement of decision, we also may consider the court's oral tentative decision.  (*United Pacific Ins. Co. v. Hanover Ins. Co.* (1990) 217 Cal.App.3d 925, 934.)  In this case, the tentative ruling repeatedly invokes the correct legal standard and never articulates an incorrect one:

- "I don't see any evidence . . . that there's a reasonable apprehension that he's going to harm the children at this point."

- "The court has to look at under *Ritchie* and others, does [Valerie] still have a reasonable apprehension that [Robert] will engage in physical altercations with her or harass her." (Italics added.)

- "So I don't believe that there's a reasonable apprehension that [Robert] will physically harm her or assault her."

12

- "Now, as to disturbing her peace . . . there were violations of the restraining order. . . . [¶] [But] I still need to find that reasonable apprehension of harm or reasonable apprehension that he is going to disturb her peace."

- "I do not believe that the testimony of the monitor was established by a preponderance of the evidence that he— that there's a reasonable apprehension that he will disturb her peace."

- "It's irritating, but I don't think it rises to an apprehension of harm that's reasonable."

- "But there's nothing in [Robert's] behavior and belief, as he's expressed it, which leads me to think that's what she should have an app—that's what she's apprehensive about."

- "I think that that still does not give rise to a reasonable apprehension of harm or reasonable apprehension that he will disturb to her peace."

- "The disturbing of the peace, quoting the Bible scripture, may disturb—may irritate her, as I said, and may disturb her peace, but I don't believe that, by a preponderance of the evidence, that's a reasonable apprehension . . . ."

Last, we consider the court's statements about the applicable law during trial. Here too, the court consistently applied the correct legal standard. For example, ruling on the relevancy of the 2018 incident, the court stated, "I have to determine whether there's a reasonable apprehension going forward." Later the court allowed questions about Robert's religious beliefs "so that I can determine whether her fear is reasonable." Near the end, the court suggested that Valerie's counsel explore on redirect "the nature of [Valerie's] fear" arising from Robert's religious beliefs.

Based on the record as a whole, we are confident that the trial court correctly understood the legal standard for renewing a DVRO. (See *People v. Cartier* (1960) 54 Cal.2d 300, 313 ["where a judge's statements as a whole

13

disclose a correct concept of the law and its application, no secondary remarks should be deemed to have impeached his determination"].)

In urging the opposite conclusion, Valerie also points to a portion of the tentative ruling where the court stated there was no evidence showing "a reasonable apprehension that [Robert is] going to harm the children at this point." She maintains this "implies that a renewal for their protection required evidence [Robert] would commit *physical* violence towards them" and claims this "mimics" the trial court's error in *Perez v. Torres-Hernandez* (2016) 1 Cal.App.5th 389 (*Perez*).

We understand the court's remarks differently. "Harm" is not limited to physical violence. It connotes any type of "abuse" within the meaning of the Act, including "harassing" and "disturbing the peace of the other party." (§§ 6203, subd. (a)(4), 6320, subd. (a).)

Moreover, *Perez* does not support Valerie's argument. The trial court in that case declined to renew a DVRO based on the misapprehension that " 'abuse must be violence or the infliction of violence on an individual.' " (*Perez, supra,* 1 Cal.App.5th at p. 395.) The court of appeal reversed because under the Act, "the definition of abuse . . . is much broader" and includes "[a]nnoying and harassing an individual." (*Id.* at p. 399.) But as just explained, here the judge did not commit *Perez* error. To the contrary, she recognized that not only physical altercations, but also harassment and other "harm" would support an order renewing a DVRO.

In a related argument, Valerie contends the court erroneously required evidence that she feared physical abuse. In advancing this claim, Valerie selectively chooses sentences from the tentative ruling and statement of decision where the trial judge determined whether Valerie had a reasonable apprehension that Robert would engage in "physical altercations" or

14

"physically harm her or assault her." Citing *Eneaji v. Ubboe* (2014) 229 Cal.App.4th 1457, which held there is no requirement that the party seeking a DVRO renewal must fear physical abuse, Valerie asserts these passages show the trial court applied an incorrect legal standard.

But again, Valerie's argument hinges on taking isolated fragments of the decision out of context. It is true, of course, that the trial court addressed Valerie's fear or apprehension of future physical violence. But that is undoubtedly because domestic violence obviously includes, although it is not limited to, physical harm. Moreover, Valerie's lawyer argued the case this way. Reminding the court in closing argument that the initial DVRO was "granted based upon physical violence," he asserted, "the same circumstances exist for the violence today." Moreover, the court *also* considered whether Valerie had a reasonable apprehension that other forms of alleged abuse— e.g., harassment, unwanted gift-giving, bible-thumping—would disturb her peace. When read as a whole, as it must be, the statement of decision is not limited to Valerie's apprehension of physical violence.

B.  *The Evidence Does Not Compel a Finding in Valerie's Favor*

Valerie contends that if the trial court had applied the correct standard, it would have had "no choice but to grant the DRVO renewal." She claims the "[f]ailure to grant the renewal, based on the facts of this case . . . would be error as a matter of law." In considering this argument, the issue is whether the evidence compels a finding in Valerie's favor as a matter of law. "Specifically, the question becomes whether the appellant's evidence was (1) 'uncontradicted and unimpeached,' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.'" (*Shaw v. County of Santa Cruz* (2008) 170 Cal.App.4th 229, 279.)

15

1.    *The court considered the 2018 incident*

Asserting that the facts underlying the initial DVRO were "heinous" and "vicious," Valerie contends the trial court failed to consider whether that incident "alone" justified renewal. Citing her own declarations, she contends the abuse continued for a six year period and Robert "repeatedly physically attacked her" and "threatened to kill her by slitting her throat."

This argument fails for two reasons. First, Valerie's version of the events was both contradicted and impeached. In granting the original DVRO, the court noted that "portions of [Valerie's] testimony are different from her pleadings as to chocking [*sic*]" and she is the one who "initiated the arguments." Moreover, the "visible injuries" she claims turn out to be a "small pimple-like mark" on her finger that did not require medical attention. According to the police report from the 2013 incident, Robert did *not* threaten to kill Valerie, nor did he choke or strangle her.[12] Additionally, Robert disputed Valerie's account of the 2013 incident. He explained that Valerie slapped him and he "left and went to the police station to file [his] own report" and "that's when [he] was detained because she had called [the police] ahead." He was held for six hours, released with no charges filed, and he and Valerie continued living together.

Second, the record shows that the trial judge *did* consider this issue. Indeed, it is the *first* substantive issue in the statement of decision, which states:

---

[12]    Valerie told police that after she slapped him twice, Robert slid his index finger across his neck and said, "If this was three years ago, I would have cut your throat." Robert told police that what he actually said was, "If I was that type of guy I would have cut your throat."

16

"In her request for the original restraining order . . . [Valerie] outlined physical violence by [Robert] in the presence of the children, and violence that she testified had occurred over a number of years before. There was at least one incident and arrest in 2013 as a result of an altercation in the home between these parties."

Valerie's attorney argued that because Robert believes he did nothing wrong in 2018, that alone represented a risk of future abuse. The court considered but ultimately rejected the argument, stating "that alone is not a basis to grant a permanent restraining order."

2. *The trial court considered Robert's violations of the DVRO*

Valerie contends the court "further erred by failing to consider and give due weight to Robert's multiple willful violations of the DVRO." But once again, the court did consider that evidence. The statement of decision notes that "after the protective order was in place" Robert "came to [Valerie's] previous home and dropped off a car that she had been given the right to possess." The judge stated she was "not calling this a 'technical violation' or disregarding it." Rather, she noted that although it "*was a violation of the restraining order*, this alone would not establish a reasonable apprehension of physical violence." (Italics added.)

The court also considered evidence that Robert violated the DVRO by (1) trying to block Valerie from leaving a parking lot during an unmonitored exchange; (2) visiting Son at his school; and (3) attempting to reconcile by giving Valerie gifts. The court was skeptical of the claim that Robert used his car to prevent Valerie from leaving a parking lot.[13] His other behavior was,

---

13    The court did not find Valerie's testimony on this point to be "clear or convincing." Because the court used the disjunctive "or" rather than "and," we do not understand this to be a reference to the requisite standard of proof.

17

in the judge's view, "irritating"—but insufficient to cause a reasonable apprehension of harm. While other judges might have reached an opposite conclusion, the evidence does not compel it as a matter of law and as a reviewing court, we will not second-guess the trial judge's credibility determinations.[14]

### 3. *The court considered changed circumstances*

Valerie contends the court committed "reversible error on its face" by failing to consider whether there had been a " 'significant change of circumstances' " since the DVRO originally issued. But again, the record belies this claim. The court considered Robert's religious beliefs, but concluded he is "not a racist" and "his beliefs about women do not create a reasonable apprehension of risk." Moreover, Robert testified that he has been in counseling since 2018 to address anger management and coparenting skills. The court found his testimony credible, stating:

> "[Robert] testified credibly that he had been in therapy since 2018, which he believed he initiated (although it was court ordered), and had learned from that therapy to be a better father and a better partner."

Valerie further asserts that Robert had "simply failed to move on from [the] relationship" and sent "strings of harassing messages" on Talking Parents. She insists that the trial court "failed to give due weight to *any* of this evidence."

---

To the contrary, throughout the statement of decision the court correctly states the preponderance-of-the-evidence  standard applies.

[14]    Valerie's reliance on *Lister v. Bowen* (2013) 215 Cal.App.4th 319 does not advance her argument. In that case, the issue was whether an order renewing a DVRO was supported by substantial evidence. Here, the issue is whether the evidence compels a finding—as a matter of law—opposite the one reached by the trial court.

But Valerie's argument distorts the record—the evidence was not nearly so one-sided. Robert denied putting notes on Valerie's car and testified he has no interest in reconciling with her. He explained:

> "Counseling has helped a lot in a lot of ways. . . . [¶] I've learned to grow. I've grown to where I wish Valerie the best moving forward. I hope she finds someone who she can grow old with, and I wish her the best. Counseling has really helped me . . . ."

Moreover, the "strings" of messages encompassed more than a two-year period. The court addressed this too in the statement of decision and concluded, "[S]o broken down by week the messages are not harassing in volume."

4. *The court considered the relative benefits and burdens of renewal*

Last, Valerie contends the trial court erred by failing to "consider and acknowledge" that any burden on Robert from renewing the DVRO was "outweighed by Valerie's need for protection." But as we have discussed, the court found that Valerie did not need DVRO protection. There was little to weigh. And in any event, the court did balance benefits and burdens, stating:

> "I went back and forth in my mind, but I weigh against the impact of the restraining order on the other party. So it's not like these orders don't have significance. They're supposed to be significant. They're supposed to be strong. [¶]
>
> "And in this case, the impact on [Robert] in terms of his relationship with the children, when I don't believe he's a harm to the children. His beliefs may be something [Valerie] disagrees with. I get that . . . . [¶]
>
> "The disturbing of the peace, quoting Bible scripture, may . . . irritate her, as I said, and may disturb her peace, but I don't believe that, by a preponderance of the evidence, that's a reasonable apprehension, and that it rises to the

19

level of the restraint that would be needed on [Robert] to issue a restraining order, which does make it hard to find jobs, which does make it difficult to function in the world, and he had expressed that in his testimony."

## DISPOSITION

The order is affirmed. Respondent is entitled to costs on appeal.


DATO, J.

WE CONCUR:


McCONNELL, P. J.


HUFFMAN, J.