Filed 4/17/23  P. v. Adams CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### SECOND APPELLATE DISTRICT

### DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B316494 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. MA064049) |
| v. | |
| GARRETT ADAMS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Lisa Strassner, Temporary Judge.  Affirmed.

Law Office of Elizabeth K. Horowitz, Inc. and Elizabeth K. Horowitz, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Noah P. Hill, Supervising Deputy Attorney General, and Stephanie A. Miyoshi, Deputy Attorney General, for Plaintiff and Respondent.

## INTRODUCTION

This appeal, Garrett Adams's second, is from a judgment after a jury convicted him (a second time) of first degree mayhem felony murder.  In his prior appeal, Adams argued, among other things, that substantial evidence did not support the jury's finding he specifically intended to commit mayhem and that the trial court's instruction on mayhem felony murder was erroneous.  We reversed his murder conviction because, although there was substantial evidence Adams specifically intended to commit mayhem, the trial court did not instruct the jury that the People had to prove Adams had the specific intent to disable or disfigure his victim.  (*People v. Adams* (Aug. 29, 2019, B284753 [nonpub. opn.] (*Adams I*).)  The People retried Adams, and the jury again convicted him of first degree mayhem felony murder.  The trial court sentenced Adams to a prison term of 26 years to life.

In this appeal Adams argues (1) the trial court erred in giving an instruction on felony murder that was based on the wrong underlying felony, (2) the evidence did not support an instruction on mayhem felony murder, (3) the court erred in failing to give lesser included instructions on second degree murder and voluntary manslaughter, (4) the prosecutor committed misconduct in his closing argument by diluting the reasonable doubt standard, and (5) the cumulative effect of these errors deprived him of a fair trial.  Finding no prejudicial or cumulative error, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A.     *A Jury Convicts Adams of Felony Murder*

After several drinks one evening in August 2014, Adams and his girlfriend, Bernadette Marquez, began fighting.  Adams's brother Cameron Adams (Cameron) and Cameron's friend, Charles Briggs, both of whom had also been drinking, arrived at Adams's house and argued with Adams.  The three men wrestled outside and hit each other; when the fighting stopped, Adams went inside the house.  A few minutes later, Adams came out of the house with a compound bow[1] and several razor-tip hunting arrows.  After a brief exchange of words between Adams (threatening) and Briggs (taunting), Adams shot Briggs in his torso with an arrow.  Briggs stumbled down the street, collapsed, and later died at the hospital.  (*Adams I, supra*, B284753.)

A jury acquitted Adams of first degree premeditated murder, but convicted him of first degree mayhem felony murder (Pen. Code, § 189, subd. (a))[2] and found true allegations Adams personally used a deadly or dangerous weapon (§ 12022,

---

[1]     A compound bow is a bow that has cams (a system of wheels and cables) that attach the string to the curved part of the bow.  The cams allow the archer to use less force when pulling the string back, which in turn allows the archer to "hold on target a little longer" and improve accuracy.  (See *Parker Compound Bows, Inc. v. Hunter's Manufacturing Company, Inc.* (W.D.Va., Feb. 12, 2016, No. 5:14CV00004) 2016 WL 617464, p. 1 ["compound bows have wheels at the opposite ends of the bow that receive the bowstring"].)

[2]     The jury also acquitted Adams of other offenses not relevant to this appeal.  Statutory references are to the Penal Code.

subd. (b)(1)).  The trial court sentenced Adams to a prison term of 25 years to life on his first degree mayhem felony murder conviction, plus one year for the weapon enhancement.  (*Adams I*, *supra*, B284753.)

B.    *Adams Appeals, and We Reverse*

Adams appealed, contending that substantial evidence did not support the jury's finding he specifically intended to maim Briggs and that the trial court erred in failing to instruct the jury the People had to prove he had the specific intent to maim.  We disagreed with Adams's first contention, but agreed with his second.  We explained that, although mayhem as defined in section 203 "is a general intent crime," felony murder based on mayhem, like aggravated mayhem (§ 205), "is a specific intent crime."  Thus, we held, the trial court should have instructed the jury that the People had to prove Adams had the specific intent to maim.  (*Adams I*, *supra*, B284753.)

We observed that the pattern instruction for aggravated mayhem, CALCRIM No. 800, states as one of the elements of that crime the People must prove that, "'when the defendant acted, (he/she) intended to (permanently disable or disfigure the other person/ [or] deprive the other person of a limb, organ, or part of (his/her) body).'"  We pointed out that the trial court did not give this or any other instruction requiring the jury to find Adams had "the specific intent to commit the underlying felony."  Because we concluded the instructional error was not harmless, we reversed the judgment.  (*Adams I*, *supra*, B284753.)

4

C. *A Jury Again Convicts Adams of Felony Murder*

The People retried Adams. In a second amended information, the People charged Adams with one count of murder (§ 187, subd. (a)) and alleged he personally used a deadly or dangerous weapon, within the meaning of section 12022, subdivision (b)(1). As she had in the first trial, Marquez testified about the events that led to Briggs's death. Marquez stated Adams had been drinking that day and wanted to continue drinking when he got home. Marquez stated that she argued with Adams and that, after a heated exchange, Adams threw a glass candlestick at her, which hit her back before breaking on the floor. She also stated that Adams left the house for three or four hours and that, while he was gone, Cameron called Adams's cell phone. Marquez said she answered it and told Cameron "what had happened." Marquez testified that, when Adams returned to the house, she and Adams continued to argue, that Marquez "became violent" and put Adams in a headlock, and that Adams became "really upset," choked her, and hit her in the face.

Marquez testified that when Cameron arrived at the house he pulled Adams off her and told him to stop. Marquez said she ran outside the house and saw Briggs standing in the front yard. Marquez stated that Briggs, who also appeared to have been drinking, asked Marquez if she was hurt and used light from his cell phone to check her face for injuries. Marquez said that a minute or two later Adams and Cameron came out of the house and that Adams was angry and upset Briggs was there. Marquez stated that all three men yelled at each other and began to wrestle on the ground and that, as Adams and Briggs fought, Cameron tried to separate them.

5

Meanwhile, Marquez testified, the dogs Adams and Marquez owned were barking at Briggs, and Briggs said, "I'm going to kill those dogs if they bite me." Marquez stated she went to "contain" the dogs, Adams went inside the house, and Briggs and Cameron stayed outside in the front yard, near the sidewalk. Marquez said she heard Briggs say to Cameron, "I didn't sign up for this" and "Man, why did you have me come here?"

Marquez testified Adams came back outside five to 10 minutes later holding his compound bow. Marquez stated she hid between two cars because she was afraid Adams would shoot her with the bow. According to Marquez, Adams aimed the bow, which had an arrow notched on the string, at Briggs (and Cameron, who stood between Adams and Briggs) and said to Briggs, "You need to leave now. You'd better leave, or I'll shoot you." Cameron told his brother, "Put that down. Put it away," and Briggs said, "You're not going to shoot me." Marquez said Briggs backed up slowly into the street, Adams moved toward Briggs, and Cameron said to Adams, "Stop. Please don't. You're going to go to jail." Briggs said to Adams, "What? Are you going to shoot me? Do you think I'm scared to die? Shoot it. Just let it go." Marquez testified Adams adjusted his bow, aimed it at Briggs, pulled back the string, and told Cameron to move out of the way. Marquez said that by this point the three men were several houses down the street, with Briggs walking backward, Adams following him, and Cameron staying between the two men.

A neighbor testified she saw Briggs retreating down the street, trying to "defuse the situation," while Adams, who appeared "very angry," yelled at Briggs as Adams moved toward him with his bow and arrow. Another neighbor testified

6

Cameron said to Adams, "Just calm down.  It's not worth it.  Just get back inside."  The second neighbor recalled that the three men stopped shouting at each other, that it appeared "things had calmed down," and that "all the parties were going to go their separate ways," with Briggs "still walking backward away" from Adams.  But then, the neighbor said, Adams raised his bow, which had an arrow ready, pulled back the string, and fired "a straight shot" at Briggs.  According to the neighbor, Adams said to Briggs, "I told you, homie.  That's what you get," and Cameron said, "What the fuck.  Call the cops."

A videotape of the incident showed that, immediately after Adams shot Briggs, Briggs screamed and asked Adams, "Why'd you do that?"  Adams responded, "That's what you get, homie!"  Briggs cried for help, and Adams said, "I'm about to shoot you with my gun, homie, you better run."

A registered nurse testified he happened to be driving in the neighborhood and saw Briggs approach him and collapse.  The nurse stated Briggs had a "penetrating chest wound" and was bleeding profusely.  The nurse rendered aid until the police arrived.  The nurse, also a recreational hunter, said the arrow, which was sticking out of Briggs's back, had a "broad head" tip used by hunters.

As Briggs lay in the street, Adams ran to his next-door neighbor's house, knocked on the door, and said, "Call the cops.  I shot the nigger."  Adams said he and Marquez "had a home invasion."  Marquez testified Adams gave her the bow and told her to "go put this somewhere" and to "stick with" the story "it was a home invasion."

An archery expert testified about the mechanics of a compound bow, which was what he also used for hunting and

target practice. The expert said the cams on a compound bow have a "let-off" point where, once the archer pulls back using a certain amount of force, the bow will "let off" and allow the archer to continue pulling on the string, but using, for example, only half the amount of force, which allows the archer to "hold on target a little longer." In the expert's opinion, someone striving to "be as accurate as possible" would choose a compound bow. The expert identified the arrow Adams used to kill Briggs as a broad head arrow and explained broad head arrows are very sharp and used for hunting, where the hunter aims for a major blood vessel, the heart, or the lungs, so that the animal will "bleed out." The expert stated it was "common knowledge among people who hunt with bows" that such an arrow would cause significant organ damage if it hit a human being or other animal.

Adams told a sheriff's deputy he was an "avid hunter" who used a bow and arrow and a rifle. Adams said he had not purchased meat in more than seven years because "he hunted for his food." Adams told a detective that when he hunts he focuses on his prey's "vitals" to maximize the animal's bleeding. Adams stated, "That one shot is very important because you worked—hiked for miles just for that one shot."

Finally, the parties stipulated to several facts. They were: Sheriff's deputies found the compound bow and arrows in the garage and a rifle in the closet of the master bedroom;[3] law enforcement personnel tested the compound bow and found it "to be fully functional"; the compound bow Adams used to kill Briggs had a peak draw weight of 50 pounds and, at the let-off point, the

---

[3] A forensic identification specialist testified he found four arrows in a quiver attached to the bow.

draw weight for the bow dropped to approximately 20 pounds and became easier to hold; and an autopsy report found that Briggs had a lacerated liver and pancreas and a ruptured spleen and that he died of "penetrating sharp force injuries of the abdomen."

At the close of evidence, the People filed a third amended information to replace the murder count with a first degree felony murder count and to add a count of second degree murder. The People included the allegation Adams personally used a deadly or dangerous weapon in the commission of both offenses (§ 12022, subd. (b)(1)).

The jury found Adams guilty of mayhem felony murder and found true the allegation under section 12022, subdivision (b)(1). The jury did not reach a verdict on the second degree murder count, and the court declared a mistrial on that count.[4] The court sentenced Adams to a prison term of 25 years to life, plus one year for the weapon enhancement. Adams timely appealed.

## DISCUSSION

A.  *The Trial Court Erred in Basing the Felony-murder Instruction on the Wrong Felony, but the Error Was Harmless*

Adams contends the court erred by giving an instruction on felony murder that was based on the wrong underlying crime— aggravated mayhem instead of mayhem. We agree the court erred in instructing the jury that the underlying felony for the felony murder count was aggravated mayhem. The error, however, was harmless.

---

[4]     The court subsequently granted the People's motion to dismiss the second degree murder count without prejudice.

9

1.     *Relevant Proceedings*

The trial court instructed the jury on felony murder with CALCRIM No. 540A: "The defendant is charged in count 1 with murder, under a theory of felony murder. . . .  The People must prove that:  (1) the defendant committed aggravated mayhem; (2) the defendant intended to commit aggravated mayhem; and (3) while committing aggravated mayhem, the defendant caused the death of another person.  A person may be guilty of felony murder even if the killing was unintentional, accidental, or negligent."  The court instructed the jury on aggravated mayhem with CALCRIM No. 800:  "The defendant is charged with aggravated mayhem in violation of . . . section 205.[5]  To prove that the defendant is guilty of this crime, the People must prove that:  (1) the defendant unlawfully and maliciously disabled or disfigured someone permanently or deprived someone else of a limb, organ, or part of his body; (2) when the defendant acted, he intended to permanently disable or disfigure the other person or deprive the other person of a limb, organ, or part of his body; and (3) under the circumstances, the defendant's act showed extreme indifference to the physical or psychological well-being of the other person."

In his closing argument, the prosecutor explained the elements of first degree felony murder as follows:  "What is first degree felony murder?  It's that [Adams] is trying to maim [Briggs], . . .  and in the process, he kills him, even if done unintentionally.  That's a first degree felony murder.  That maiming, that word maiming, I'm going to talk about it, because the judge read to you this instruction about something called

---

[5]     The People did not charge Adams with aggravated mayhem.

10

aggravated mayhem.  He's not charged with it, but it's part of the felony murder. . . .  What do we have to prove for you to find him guilty of aggravated mayhem?  It's three things:  One is that he disabled or disfigured someone permanently or deprived them of a use of an organ or a body part.  And . . . the legal term for that is maiming. . . .  So it's that he maimed him and that he intended to do that.  It wasn't like an accident or something he didn't mean to have happen.  He intended it.  And that he showed extreme indifference to [Briggs's] physical or psychological well-being.  That's an aggravated mayhem."

The prosecutor proceeded to discuss the evidence that supported a finding of aggravated mayhem:  "What's the evidence?  Did [Adams] deprive [Briggs] of an organ?  Yeah.  You have in evidence the coroner's report. . . .  And the coroner did an autopsy.  And [Briggs's] liver was perforated.  His pancreas lacerated.  His spleen is ruptured and has actually been surgically removed.  It's so badly damaged, it's not even in his body anymore.  When they tried to save him, they surgically took that out.  So he's lost use of all those organs."  The prosecutor discussed the manner in which Adams inflicted the maiming injury to show Adams intended "to damage and destroy [Briggs's] organs."  The prosecutor argued the evidence also showed Adams exhibited extreme indifference to Briggs's physical and psychological well-being.

2.      *Applicable Law and Standard of Review*

"'In criminal cases, even in the absence of a request, a trial court must instruct on general principles of law relevant to the issues raised by the evidence and necessary for the jury's understanding of the case.'"  (*People v. Townsel* (2016) 63 Cal.4th

11

25, 58; see *People v. Hartland* (2020) 54 Cal.App.5th 71, 77; *People v. Campbell* (2020) 51 Cal.App.5th 463, 493.) "'The trial court has a sua sponte duty to instruct the jury on the essential elements of the charged offense.'" (*People v. Rivera* (2019) 7 Cal.5th 306, 332; accord, *People v. Sta Ana* (2021) 73 Cal.App.5th 44, 60; *People v. Wetle* (2019) 43 Cal.App.5th 375, 381.)

"A claim of instructional error is reviewed de novo." (*People v. Mitchell* (2019) 7 Cal.5th 561, 579; see *People v. Hartland*, *supra*, 54 Cal.App.5th at p. 77.) "An appellate court reviews the wording of a jury instruction . . . and assesses whether the instruction accurately states the law." (*Mitchell*, at p. 579; see *People v. Campbell*, *supra*, 51 Cal.App.5th at p. 493.)

> 3.  *The Trial Court Erred in Instructing the Jury the Underlying Crime for Felony Murder Was Aggravated Mayhem*

Section 189, subdivision (a), defines felony murder:  "All murder . . . that is committed in the perpetration of, or attempt to perpetrate, arson, rape, carjacking, robbery, burglary, mayhem, kidnapping, train wrecking, or any act punishable under [statutes that define, among other crimes, torture, sodomy, and lewd or lascivious acts on a child under the age of 14] . . . is murder of the first degree."  (See *People v. Baker* (2021) 10 Cal.5th 1044, 1105 ["A homicide committed during the perpetration of certain felonies enumerated by statute . . . is murder of the first degree."]; *People v. Powell* (2018) 5 Cal.5th 921, 942 (*Powell*) ["'"The felony-murder rule makes a killing while committing certain felonies murder without the necessity of

12

further examining the defendant's mental state."'"].)[6]  While the statute lists mayhem as one of the felonies that may serve as the underlying offense for first degree felony murder, the statute does not list aggravated mayhem.  Thus, the trial court erred in instructing the jury it could convict Adams of first degree felony murder with aggravated mayhem as the underlying offense.  (See *Baker*, at p. 1105 ["homicide committed during the perpetration of unenumerated inherently dangerous felonies is murder of the second degree"]; *Powell*, at p. 942 [if the felony is not listed in section 189, subdivision (a), "'"the murder is of the second degree"'"].)

> 4.     *The Error Was Harmless*

The trial court's instructional error on an element of the charged offense, first degree felony murder, "is reversible unless 'it is clear beyond a reasonable doubt that a rational jury would have rendered the same verdict absent the error.'"  (*People v. Rivera, supra*, 7 Cal.5th at p. 333; see *People v. Haley* (2004) 34 Cal.4th 283, 316 ["if the trial court erroneously instructs on felony murder, reversal is not required if there is a basis in the record to conclude that the verdict was based on a valid theory of guilt"].)  In *Haley* the trial court erroneously instructed the jury it

---

[6]     In 2019 the Legislature amended section 189 "to ensure that murder liability is not imposed on a person who was not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life."  (Stats. 2018, ch. 1015, § 1, subd. (f)); see *People v. Gentile* (2020) 10 Cal.5th 830, 842.)  The changes to section 189 did not affect the application of the felony murder rule in this case because Adams was the actual killer.  (See *People v. Lopez* (2023) 88 Cal.App.5th 566, 575].)

could find the defendant guilty of first degree felony murder based on the underlying felony of sodomy, which was not one of the offenses listed in section 189 at the time of the crimes. But because the jury found true the felony-murder special circumstance allegation the defendant killed the victim during the course of a robbery and burglary, the jury necessarily found the defendant had the specific intent to commit robbery or burglary, which meant "the jury unanimously found [the] defendant guilty of first degree murder on the valid theory that the killing occurred during the commission of a robbery or burglary." (*Haley*, at p. 316.)

Adams's first degree murder conviction was based on a valid theory of guilt. Section 203, which defines the crime of mayhem, provides: "Every person who unlawfully and maliciously deprives a human being of a member of his body, or disables, disfigures, or renders it useless, or cuts or disables the tongue, or puts out an eye, or slits the nose, ear, or lip, is guilty of mayhem." (See *People v. Romero* (2019) 44 Cal.App.5th 381, 386 ["A member of the body is a general term describing any integral part or vital organ of the body."].) Mayhem is a general intent crime. (*People v. Rodarte* (2014) 223 Cal.App.4th 1158, 1170; see *People v. Quarles* (2018) 25 Cal.App.5th 631, 636.) But when mayhem serves as the underlying felony of a first degree felony murder charge, the People must prove the defendant had the "specific intent to maim." (*People v. Gonzales* (2011) 51 Cal.4th 894, 941 (*Gonzales*); accord, *People v. Anderson* (1965) 63 Cal.2d 351, 358; see *People v. Ghobrial* (2018) 5 Cal.5th 250, 279 ["For felony murder, the required mental state is the specific intent to commit the underlying felony."]; *People v. Garcia* (2022) 82 Cal.App.5th 956, 962 [same].)

14

Section 205, which defines the crime of aggravated mayhem, provides in relevant part: "A person is guilty of aggravated mayhem when he or she unlawfully, under circumstances manifesting extreme indifference to the physical or psychological well-being of another person, intentionally causes permanent disability or disfigurement of another human being or deprives a human being of a limb, organ, or member of his or her body." (See *People v. Manibusan* (2013) 58 Cal.4th 40, 86 (*Manibusan*).) As discussed, one of the elements the People must prove under section 205 is "'the defendant acted with the specific intent to cause a maiming injury'" (*ibid.*; see *People v. James* (2015) 238 Cal.App.4th 794, 811), the very same kind of injury section 203 requires. (See *Gonzales*, *supra*, 51 Cal.4th at p. 941 [mayhem felony murder requires "specific intent to maim"].)

In other words, mayhem is a lesser included offense of aggravated mayhem. (*People v. Robinson* (2014) 232 Cal.App.4th 69, 78 (*Robinson*); see *People v. Newby* (2008) 167 Cal.App.4th 1341, 1347-1348 ["the difference between simple mayhem and aggravated mayhem . . . is the requisite criminal intent," and "the permanent disfiguring injury requirement is the same under each statute"].) The jury's finding Adams had the specific intent to commit aggravated mayhem encompassed a finding Adams had the specific intent to commit mayhem. Thus, the errors in the jury instruction on felony murder (listing aggravated mayhem as the underlying felony) and the court's instruction on the corresponding elements of aggravated mayhem (which included the elements of simple mayhem) were harmless.

Adams asserts "the lesser included analysis from *Robinson* only applies when intent is not at issue." According to Adams, "when intent is at issue, as it is here, then the different language

[of section 203 and section 205] *does* matter, because the fact-finder . . . must assess what, if anything, *was intended* by the defendant, thus making the language of that statute significant to determining exactly what type of specific intent is required." Adams reads into *Robinson* a limitation that does not exist.

The court in *Robinson*, *supra*, 232 Cal.App.4th 69 concluded that, notwithstanding the Legislature's decision to use different words to describe the injuries covered under section 203 and section 205, "the Legislature was not concerned with whether the types of injuries which could constitute aggravated mayhem would also constitute simple mayhem, but rather with the intent and mental state underlying the infliction of the injuries." (*Id.*, at p. 78.) The court stated the Legislature "was concerned only with adequate punishment for mayhem committed with the particular intent and mental state the Legislature considered worthy of harsher punishment." (*Ibid*.) Relying on the Supreme Court's analysis in *People v. Santana* (2013) 56 Cal.4th 999, the court in *Robinson* observed that an act committed under section 203 "cannot be distinguished from" an act committed under section 205, "except by the intent and mental state with which the act is committed." (*Robinson*, at p. 79.) As discussed, because mayhem felony murder requires a specific intent to commit mayhem, that element is identical to the specific intent element of aggravated mayhem. Contrary to Adams's suggestion, *Robinson* does not suggest section 203, when used as the basis for felony murder, requires a different "type of specific intent" from that required under section 205.

Adams also argues that "the instruction given in this case allowed the jury to convict if it found [he] only broadly 'intended to permanently disable or disfigure' Briggs in some unspecific

16

way" and that "the specific intent to commit mayhem under *section 203* requires something more than that." The instruction, however, did no such thing, and as discussed the relevant injuries contemplated by section 203 and section 205 are the same. The defendant can commit both aggravated mayhem and mayhem by depriving the victim of a member of his body, such as an organ or group of organs. (Compare CALCRIM No. 800 (aggravated mayhem) ["the defendant unlawfully and maliciously disabled or disfigured someone permanently or deprived someone else of a limb, organ, or part of his body"] with CALCRIM No. 801 (mayhem) ["the defendant unlawfully and maliciously" (1) "Removed a part of someone's body"; (2) "Disabled or made useless a part of someone's body and the disability was more than slight or temporary"; (3) "Permanently disfigured someone"; or (4) inflicted certain injuries on the face].) The prosecutor argued, and the evidence supported the jury's finding, Adams had the specific intent to deprive Briggs of the organs where his arrow penetrated and went through his body (the liver, pancreas, and spleen). Section 203 applies to a defendant who inflicts such maiming injuries. (*People v. Santana, supra,* 56 Cal.4th at p. 1003; see *People v. Cartier* (1960) 54 Cal.2d 300, 310 (*Cartier*) ["It is mayhem if the injury inflicted deprives the person injured of a member of his body or the usual uses of the severed organ."].)

> B.  *Substantial Evidence Supported the Trial Court's Instruction on Felony Murder*

Adams argues substantial evidence did not support the instruction the trial court gave on mayhem felony murder because "none of the evidence shows that [he] acted with a specific intent to 'deprive' Briggs of his spleen, or to 'disable[ ],

17

disfigure[ ], or render[ ] it useless.'"  As part of this argument, Adams asserts that "an instruction on felony murder mayhem actually requires something more than evidence of an intent to commit just *some type of* maiming/permanent injury"; it "requires evidence of an intent to inflict a *particular* permanent injury or disfigurement on the victim."  Because the second argument is wrong, the first one is too.

### 1. *Mayhem Felony Murder Requires the Specific Intent To Maim—No More, No Less*

As discussed, section 203 states:  "Every person who unlawfully or maliciously deprives a human being of a member of his body, or disables, disfigures, or renders it useless, . . . is guilty of mayhem."  The statute uses the indefinite article "a" before the words "member of his body," rather than an adjective like "particular."  When the People allege mayhem as the underlying felony for felony murder, the People must prove the defendant had the specific intent to deprive a human being of *a* member of that person's body (or to disable, disfigure or render it useless); that is, the specific intent "to maim."  (*Gonzales*, *supra*, 51 Cal.4th at p. 941; see *Robinson*, *supra*, 232 Cal.App.4th at p. 77 ['"Mayhem [is] an older form of the word "maim.""'].)  The language of section 203 does not require the People to prove the defendant intended to inflict injuries to a particular member or organ of the victim's body.  (See *People v. Santana*, *supra*, 56 Cal.4th at p. 1003 ["Section 203 generally prohibits six injurious acts against a person, three that specify a particular

18

body part and three that do not."].)[7] Because section 203 does not require injury to a specific body part, when section 203 serves as the underlying felony for a felony murder charge, the People do not (contrary to Adams's assertion) have to prove the defendant had the specific intent to injure a particular body part of the victim.

Consistent with the statutory language, courts have used the more general phrase "specific intent to maim" or "specific intent to commit mayhem" to describe this element of the crime. (See *Gonzales*, *supra*, 51 Cal.4th at pp. 939, 941 [jury instructions "properly informed the jury that mayhem felony murder requires the specific intent to commit mayhem," and the jury "had more than enough evidence of specific intent to maim"]; cf. *People v. Anderson*, *supra*, 63 Cal.2d at p. 359 [trial court erred in instructing on mayhem felony murder where the record did not "disclose substantial evidence showing a specific intent to commit mayhem"]; *People v. Sears* (1965) 62 Cal.2d 737, 745 [trial court erred in instructing on mayhem felony murder in the absence of "a showing of specific intent to commit mayhem"], overruled on another ground in *People v. Cahill* (1993) 5 Cal.4th 478, 509, fn. 17.) Rather than requiring evidence that the defendant intended to maim a particular organ or part of the victim's body, courts instead require that the manner of attack was deliberate and controlled, rather than "indiscriminate." (*Gonzales*, at

---

[7] The Supreme Court in *People v. Santana* stated that the three injurious acts that specify a particular body part are "cutting or disabling the tongue," "putting out an eye," and "slitting the nose, ear or lip" and that the three that do not are "dismembering or depriving a part of someone's body," "disabling or rendering useless a part of someone's body," and "disfiguring someone." (*People v. Santana*, *supra*, 56 Cal.4th at p. 1003.)

p. 941; see *People v. Campbell* (1987) 193 Cal.App.3d 1653, 1668-1669 (*Campbell*) [the "controlled and directed nature of the attack supports an inference [the defendant] intended to disfigure [the victim's] face, including her right ear"]; cf. *Anderson*, at pp. 356, 359 [no "specific intent to commit mayhem" where the evidence, which showed "41 wounds ranging over the entire body [of the victim] from the head to the extremities," indicated "no more than an indiscriminate attack"]; *Sears*, at p. 745 [evidence showed "no more than . . . an indiscriminate attack" and did "not support the premise that [the] defendant specifically intended to maim his victim"]; *People v. Park* (2003) 112 Cal.App.4th 61, 71 ["[b]ecause there was no evidence about how or why the defendant [in *Anderson*] inflicted the particular wounds, there was no evidence to show anything more than an indiscriminate attack"].)

Nor do the cases addressing whether substantial evidence supported convictions for aggravated mayhem (which, as discussed, contains the same element of specific intent to maim as mayhem felony murder)[8] require the prosecution to prove the defendant had the specific intent to inflict a particular disfiguring or disabling injury. As with the cases on mayhem felony murder, courts ask whether the defendant carried out the attack indiscriminately or to cause a disabling or disfiguring injury. (See *Manibusan*, *supra*, 58 Cal.4th at pp. 86, 88 [aggravated mayhem requires proof "'the defendant acted with

_____

[8] Indeed, Adams argued in his opening brief in his prior appeal that, to prove mayhem felony murder, the prosecution had to show the specific intent to commit mayhem and that this intent "is essentially identical to what is required for aggravated mayhem."

the specific intent to cause a maiming injury,'" and the evidence supported the inference the defendant did not "fire indiscriminately, but focused his attack on [the victim's] head, which is a particularly vulnerable part of the body"]; *People v. Park, supra*, 112 Cal.App.4th at p. 69 [evidence the defendant limited "the scope of his attack" to the victim's head, "an extremely vulnerable portion" of the body, showed "this was not an indiscriminate attack but instead was an attack guided by the specific intent of inflicting serious injury upon [the victim's] head"]; *People v. Ferrell* (1990) 218 Cal.App.3d 828, 833, 836 (*Ferrell*) ["the specific intent to cause the maiming injury is an element of aggravated mayhem," and the shooting "was not an indiscriminate, random attack on [the victim's] body; instead, the shooting was directed and controlled"].) Neither mayhem nor aggravated mayhem has an organ-specific requirement that would have required proof Briggs intended to maim Briggs's spleen, liver, pancreas, or all three.

The trial court properly instructed the jury with CALCRIM No. 800 that the People had to prove that, when Adams acted, he "intended to permanently disable or disfigure" Briggs or "deprive [him] of a limb, organ, or part of his body." Adams did not request clarification by way of further explanation or pinpoint instruction and does not argue the trial court should have modified the language of CALCRIM No. 800 to include the additional requirement Adams had to have the specific intent to inflict a particular disfiguring or disabling injury. (See *People v. Thomas* (2023) 14 Cal.5th 327, 363 [pinpoint instructions ""are not required to be given sua sponte""]; *People v. McKinnon* (2011) 52 Cal.4th 610, 670 ["a defendant who believes an instruction requires clarification or modification must request it"]; *People v.*

21

*San Nicolas* (2004) 34 Cal.4th 614, 669 ["the burden falls on the defendant to request a 'pinpoint' instruction"].)

Adams cites several cases, each of which he argues shows "it was not just the attack in general, most of which involved several injuries that were permanent in nature, but rather a *particular* maiming/permanent injury that was relied upon as the alleged 'mayhem,' and which was found to be specifically intended in order to support the instruction." That is not what the cases say. For example, in *Gonzales*, *supra*, 51 Cal.4th 894 the defendant killed her four-year-old niece by immersing her in a bathtub of scalding hot water. The child had "injuries over an extended period of time, including a serious burn wound on her head, multiple bruises, scars, abrasions, and lacerations all over her body, subdural and subarachnoid hematomas, and the severe scalding that ultimately caused her death." (*Id.* at p. 941.) The Supreme Court rejected the defendant's argument the evidence showed "no more than an indiscriminate attack." (*Ibid.*) The Supreme Court did not discuss whether the defendant had to intend to inflict a particular injury on a specific body part.

In *Powell*, *supra*, 5 Cal.5th 921 the defendant was romantically obsessed with the victim, whom he raped, strangled, and beat to death with various sharp objects. (*Id.* at pp. 930-932.) The Supreme Court held the jury's finding the defendant committed mayhem supported the mayhem-murder special-circumstance finding under section 190.2, subdivision (a)(17). (*Id.* at p. 954.) Although the defendant in *Powell* did not challenge the jury's finding he committed mayhem, the Supreme Court stated in a footnote that the "superfluous ragged gashes in [the victim's] neck, *at a minimum*, would qualify as intentional disfigurement." (*Id.* at p. 954, fn. 10, italics added.) The

22

Supreme Court, however, did not state the defendant had to intend this specific injury (among the victim's many other disfiguring injuries, including "a seven-inch gaping skull fracture") to commit mayhem.  (*Id.* at p. 931.)

In *People v. Jentry* (1977) 69 Cal.App.3d 615 (*Jentry*) the court held the evidence showed the defendant had the specific intent to commit mayhem because there was evidence the defendant and his wife had "fantasized about torturing someone for sexual satisfaction, including castrating a male."  (*Id.* at p. 620.)  While the facts of the case included evidence the defendant and his wife excised the defendant's genitals, they also smashed the victim's skull and slit his throat "from ear to ear."  (*Id.* at p. 619.)  Although the court held the "evidence overwhelmingly established that the [defendant] and his wife intended to consummate the mayhem" (*id.* at p. 628), the court did not say the defendant had to specifically intend any particular injury to be guilty of mayhem.

In *Campbell, supra,* 193 Cal.App.3d 1653 the defendant punctured the victim's face 25 times with a screwdriver and tore off her ear with a brick.  (*Id.* at pp. 1660, 1668.)  The court held substantial evidence supported a felony-murder instruction based on "the controlled and directed nature of the attack," where the defendant "limited the amount of force he used" and "limited the scope of the attack."  (*Id.* at pp. 1668-1669.)  The issue was whether the defendant specifically intended to tear off the victim's ear "or whether he merely intended to generally attack" the victim, and the court held the defendant intended the former.  (*Id.* at pp. 1668-1669.)  While the defendant in *Campbell* intended to maim a specific body part, the court did not say mayhem required an intent to maim a specific body part.

23

And in *Cartier, supra,* 54 Cal.2d 300 the Supreme Court held substantial evidence supported the trial court's finding the defendant "murdered his wife while perpetrating the crime of mayhem" by "severing the vagina and the external genitalia from her body and cutting out her heart." (*Id.* at p. 311.) *Cartier,* however, did not involve the issue whether the defendant had the specific intent to commit mayhem. (*Id.* at pp. 310-311.)

The defendant in *Gonzales* tortured her niece to death by abusing her and burning her in a bathtub of hot water; the defendant in *Powell* beat his victim to death after sexually assaulting her; the defendant in *Jentry,* fulfilling a sexual fantasy, castrated his victim; the defendant in *Campbell* targeted his victim's ear, face, and head; and the defendant in *Cartier* severed of his wife's organs. None of these cases, however, held mayhem felony murder requires the specific intent to dismember a particular body part. Adams, an experienced hunter, aimed a highly accurate compound bow with a razor-sharp broad head arrow at Briggs's torso, intending to maim the organs there. That was specific enough. (See *People v. Santana, supra,* 56 Cal.4th at p. 1012 [evidence the defendant "stood at close range and fired three shots . . . into the leg and buttock area" of the victim "strongly" supported the finding the defendant "intended to inflict a disabling injury"]; *Gonzales, supra,* 51 Cal.4th at pp. 902, 941 [severe scalding from the victim's chest to her feet supported the jury's finding of specific intent to maim]; see also *People v. Romero, supra,* 44 Cal.App.5th at p. 387 [where the defendant stabbed the victim eight times in various parts of the body, the victim's "scarring from the stabbing attack constitutes sufficient evidence to support [the] defendant's conviction of mayhem"].)

24

Adams suggests it "would be problematic" for us to follow cases like *Manibusan* (which, as a Supreme Court decision, is binding on us) and *Ferrell* because "it could mean that for virtually all assaults with a deadly weapon that end in death, an underlying mayhem could be inferred, and therefore every such case could automatically become a first degree murder." According to Adams, under his theory of requiring the People to prove "a more specific intent to cause *a particular permanent injury*," the "problem of bootstrapping cases into the realm of felony murder can be easily avoided." Adams made a similar argument in *Adams I*, where he sought to distinguish *Manibusan* and *Ferrell* on the grounds that those cases "'were not murder cases'" and that "'those courts were not taking into consideration the danger'" of turning "'every death caused by a deadly weapon aimed at a particular part of the body into a first degree felony murder.'" (*Adams I*, *supra*, B284753.) We concluded in *Adams I* that, although "Adams's policy arguments may have some merit," section 189, subdivision (a), includes mayhem as an underlying offense for felony murder and that the Supreme Court made clear in *Manibusan* "a shooter can intend both to kill and to maim." (*Adams I*, *supra*, B284753; see *Manibusan*, *supra*, 58 Cal.4th at p. 89 ["'[A] defendant may intend both to kill his or her victim and to disable or disfigure that individual if the attempt to kill is unsuccessful.'"]; see also *People v. Burton* (1971) 6 Cal.3d 375, 387 [for the "felonies enumerated in section 189 . . . , there is an *independent felonious purpose*," and the deaths that result differ from "deaths resulting from assaults with a deadly weapon, where the purpose of the conduct was the very assault which resulted in death"], overruled on another ground in *People v. Lessie* (2010) 47 Cal.4th 1152, 1156.) As the Supreme Court held

in *Manibusan*, "the fact the victim was shot in the head can support an inference of an intent to kill," but "the same fact can support an inference of an intent to cause permanent disability or disfigurement." (*Manibusan*, at p. 88.)

Adams argues a defendant who "shoots a rifle in the direction of someone's chest, or head, or heart, and some kind of permanent internal harm is caused before the victim dies, but without evidence from which to infer that such *particular, permanent internal harm* was intended," should not be guilty of felony murder. Adams, however, intended to inflict permanent internal harm (although not with the level of specificity he thinks the law should require). As an experienced marksman, Adams selected his compound bow, armed it with an arrow used to tear through the flesh of animals he hunted, and adjusted his bow several times to take the "one shot" he believed would teach Briggs a lesson he would never forget ("That's what you get, homie"). As the Supreme Court explained, the "net effect" of an argument like Adams's "would be to eliminate the application of the felony-murder rule to all unlawful killings which were committed by means of a deadly weapon, since in each case the homicide would include *in fact* assault with a deadly weapon, even if the homicide resulted from the commission of one of the . . . felonies . . . enumerated in section 189," an outcome the Supreme Court stated was "unwarranted both in logic and in principle." (*People v. Burton*, *supra*, 6 Cal.3d at pp. 386-387.)

> 2. *Substantial Evidence Supported the Trial Court's Instruction on Felony Murder*

In determining whether the trial court erred in "'instructing the jury on a particular theory of first degree

26

murder for which there was insufficient evidence,'" we "'"review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt."'" (*People v Suarez* (2020) 10 Cal.5th 116, 168.) "'Evidence of a defendant's state of mind is almost inevitably circumstantial, but circumstantial evidence is as sufficient as direct evidence to support a conviction.'" (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1055; see *Manibusan, supra,* 58 Cal.4th at p. 87.) Specific intent "'"is rarely susceptible of direct proof and usually must be inferred from the facts and circumstances surrounding the offense."'" (*People v. Thompkins* (2020) 50 Cal.App.5th 365, 403; see *People v. Scott* (2011) 52 Cal.4th 452, 488 ["'A defendant's specific intent to commit a crime may be inferred from all of the facts and circumstances disclosed by the evidence.'"]; *People v. Mincey* (1992) 2 Cal.4th 408, 433 ["A defendant's state of mind must, in the absence of the defendant's own statements, be established by the circumstances surrounding the commission of the offense."]; *People v. Szadziewicz* (2008) 161 Cal.App.4th 823, 831 ["'"A jury may infer a defendant's specific intent from the circumstances attending an act, the manner in which it is done, and the means used, among other factors."'"], disapproved on another ground in *People v. Dalton* (2019) 7 Cal.5th 166.) Specific intent to maim "'"may not be inferred solely from evidence that the injury inflicted actually constitutes mayhem; instead, there must be other facts and circumstances which support an inference of intent to maim rather than to attack

27

indiscriminately."'" (*People v. Assad* (2010) 189 Cal.App.4th 187, 195; see *People v. Ferrell*, *supra*, 218 Cal.App.3d at p. 835.)

Substantial evidence supported the instruction on mayhem felony murder. The evidence showed the attack was anything but indiscriminate. After the drunken wrestling match in the front yard, Adams went inside his house to retrieve his compound bow, came back outside to confront Briggs, nocked a razor-tip arrow, lined up his shot as he followed Briggs down the street, and told his brother Cameron to get out of the way. And when it appeared the three men were about to disburse, Adams shot Briggs with the arrow.

Like the defendant in *Manibusan*, Adams aimed at a particularly vulnerable part of Briggs's body—here, the stomach (see *People v. Bolden* (2002) 29 Cal.4th 515, 561 [the back, which is behind the lungs and spleen, is a "vital area of the body"]; *People v. Moore* (2002) 96 Cal.App.4th 1105, 1114 [the abdomen is "an extremely vulnerable area of the body"])—to cause permanent and disabling injuries. (See *Manibusan, supra*, 58 Cal.4th at p. 89 [firing two shots into the face and upper arm "supports a finding that [the defendant] intended to cause permanent disability"]; *People v. Ferrell*, *supra*, 218 Cal.App.3d at p. 835 ["a shot in the neck from close range, if not fatal, is highly likely to disable permanently"].) Adams also shot only one arrow, even though he had additional arrows in his quiver, which supported the inference he was satisfied he had accomplished his goal of maiming Briggs. (See *People v. Park, supra*, 112 Cal.App.4th at p. 69 ["It is particularly significant that [the] defendant stopped his attack once he had maimed [the victim's] face: he had accomplished his objective."]; *Ferrell*, at p. 835 ["Once [the victim] was down, [the defendant] did not fire

28

additional shots at her, to make certain that she was dead."].)
And after Adams shot Briggs with his compound bow, he told
Briggs to run or he would shoot him with his gun, which
suggested Adams did not expect Briggs to die from the arrow, but
intended him to suffer a disabling or disfiguring injury.

C.     *The Trial Court Did Not Have a Sua Sponte Duty To
       Give Lesser Included Instructions on Second Degree
       Murder or Voluntary Manslaughter*

Adams contends that, on the first degree felony murder
count, "he was entitled to lesser included offense instructions
. . . on second degree murder and manslaughter" and that the
court "erred in not providing them." Because second degree
murder and manslaughter are not lesser included offenses of
mayhem felony murder, however, the court did not err in failing
to give those instructions sua sponte as lesser included offenses.

1.     *Relevant Proceedings*

As stated, for the retrial the People filed a second amended
information charging Adams with malice murder under section
187, subdivision (a). At a pretrial hearing, the trial court
confirmed that the People planned to proceed on the theory of
felony murder and that, because the jury had acquitted Adams of
willful, deliberate, and premeditated murder, the People would
not be proceeding on that theory. The court next addressed a
motion Adams filed to preclude the People from pursuing the
mayhem felony murder charge.[9] Adams argued that, because

_____

[9]     In summarizing the procedural history of the case, Adams
stated in the motion: "The parties agree that based on the

"there's no first-degree express malice theory anymore," the felony murder theory "becomes a little ironic in that the lesser intent . . . leads to the greater degree" and that the "intent to kill leads to a second-degree murder." The prosecutor argued the felony murder theory was "valid under Supreme Court precedent" and our decision in *Adams I*. The court denied Adams's motion, stating that we "sent this case back for potential retrial . . . on the felony murder."

As discussed, after the close of evidence, the People filed a third amended information to replace first degree malice murder with first degree felony murder. Although as Adams concedes this amendment meant the count "thereafter referred to first-degree felony murder," the count still mistakenly included language Adams murdered Briggs "with malice aforethought." The People added a separate count of second degree murder, alleging Adams murdered Briggs "with malice aforethought."

As stated, the court instructed the jury on the elements of felony murder and aggravated mayhem. The court also instructed the jury on second degree murder, and in connection with that count, the role of provocation in reducing second degree murder to manslaughter and on self-defense. The court told the jury "provocation does not apply to a prosecution under a theory of felony murder."

The jury reached a verdict on the mayhem felony murder count, but not on the second degree murder count. The court

---

previous acquittal the People are now barred from proceeding on a willful, deliberate and premeditated first degree murder theory." Adams also stated that, because of this court's holding in *Adams I*, "the People plan to retry Adams on a felony murder theory with mayhem as the alleged underlying crime."

30

instructed the jurors to return to the jury room to deliberate on the second degree murder count "irrespective of the verdict that has been reached" on the mayhem felony murder count. Outside the presence of the jury, however, the court stated that, when the court asked the jurors to "further deliberate," the "looks on their faces . . . show[ed] that they were confused." The court indicated its intention to tell the jurors not to deliberate further because to do so "would only further confuse the jury." The prosecutor asked the court to direct the jury to return verdicts on both counts; counsel for Adams agreed with the court that requesting further deliberation would be "confusing to the jury" and asked the court to take the verdict "on the count that they reached a verdict on and that [should] be it." The court (confusingly) concluded that, in the minds of the jurors, "they've reached a verdict" and that further deliberation "could potentially further confuse these proceedings." The court took the verdict on the mayhem felony murder count, excused the jury, and as discussed, declared a mistrial on the second degree murder count.

2. *Applicable Law and Standard of Review*

"A trial court has a sua sponte duty to instruct the jury on any uncharged lesser offense that is necessarily included in a charged offense if there is substantial evidence from which the jury could reasonably conclude that the defendant committed the lesser included offense but not the charged offense. [Citation.] 'To determine if an offense is lesser and necessarily included in another offense for this purpose, we apply either the elements test or the accusatory pleading test. "Under the elements test, if the statutory elements of the greater offense include all of the statutory elements of the lesser offense, the latter is necessarily

31

included in the former.'"'" (*People v. Lopez* (2020) 9 Cal.5th 254, 269-270.) "What that test requires is determining whether a given crime's elements together constitute a mere subset of another crime's elements. [Citation.] If the answer is yes, the greater offense "'"'cannot be committed without also necessarily committing [the] lesser offense.'"'" [Citation.] Which means that, so long as some additional evidence is required to support a conviction for the former, the latter is a lesser *included* offense." (*People v. Fontenot* (2019) 8 Cal.5th 57, 65.) "'"Under the accusatory pleading test, if the facts actually alleged in the accusatory pleading include all of the elements of the lesser offense, the latter is necessarily included in the former.'"'" (*Lopez*, at p. 270.) "Either of these tests triggers the trial court's duty to instruct on lesser included offenses." (*People v. Gonzalez* (2018) 5 Cal.5th 186, 197; see *People v. Smith* (2013) 57 Cal.4th 232, 240.)

However, where the information "simply track[s]" the statutory language "without providing additional factual allegations, we focus on the elements test." (*People v. Shockley* (2013) 58 Cal.4th 400, 404; see *People v. Bettasso* (2020) 49 Cal.App.5th 1050, 1057 ["'When, as here, the accusatory pleading incorporates the statutory definition of the charged offense without referring to the particular facts, a reviewing court must rely on the statutory elements to determine if there is a lesser included offense.'"]; see also *People v. Fontenot, supra*, 8 Cal.5th at p. 65 [because the amended information "merely 'incorporate[d] the statutory definition of the charged offense without referring to the particular facts' in detail, we 'must rely on the statutory elements' alone" to determine "whether one

32

offense is a lesser included offense of another"]; *People v. Robinson* (2016) 63 Cal.4th 200, 207 [same].)

The language of the second amended information (which the People filed before the retrial began) tracked the language of section 187, subdivision (a): The People alleged Adams committed "the crime of murder, in violation of" section 187, subdivision (a), "unlawfully, and with malice aforethought." (See § 187, subd. (a) ["Murder is the unlawful killing of a human being . . . with malice aforethought."].) The pleading did not provide any additional factual allegations about Adams's conduct or refer to any particular facts about the crime. The third amended information, which substituted felony murder for malice murder, also tracked the statutory language of section 187, subdivision (a) (although not the language of section 189, subdivision (a)): The People alleged Adams committed "the crime of first degree felony murder, in violation of" section 187, subdivision (a), again "unlawfully, and with malice aforethought." And again, there were no additional factual allegations about the crime or Adams's conduct. Therefore, we apply only the elements test. (*People v. Fontenot, supra*, 8 Cal.5th at p. 65; see *People v. Shockley, supra*, 58 Cal.4th at p. 404; *People v. Bettasso, supra*, 49 Cal.App.5th at p. 1057.)

Under the elements test, neither second degree murder nor voluntary manslaughter is a lesser included offense of first degree felony murder. Second degree murder requires the People to prove the defendant had malice aforethought. (*People v. Gonzalez, supra*, 5 Cal.5th at p. 197; *People v. Elmore* (2014) 59 Cal.4th 121, 133.) First degree felony murder does not. (*Powell, supra*, 5 Cal.5th at p. 942; see *People v. Bryant* (2013) 56 Cal.4th 959, 965 ["'Felony-murder liability does not require an

33

intent to kill, or even implied malice, but merely an intent to commit the underlying felony.'"]; *People v. Huynh* (2012) 212 Cal.App.4th 285, 314 (*Huynh*) ["malice is not involved in first degree felony murder"].) Thus, the defendant can commit felony murder without also committing second degree murder. (See *People v. Price* (2017) 8 Cal.App.5th 409, 429 (*Price*) [felony murder "entails commission of an inherently dangerous felony" and "requires no proof of intent or conscious disregard of life"].)

Voluntary manslaughter "is the unlawful killing of a human being without malice" in a "sudden quarrel or heat of passion." (§ 192, subd. (a); see *People v. Soto* (2018) 4 Cal.5th 968, 974 ["'Two factors may preclude the formation of malice and reduce murder to voluntary manslaughter: heat of passion and unreasonable self-defense.'"]; *People v. Elmore*, *supra*, 59 Cal.4th at p. 133 ["Punishment is mitigated for this offense, which the law deems less blameworthy than murder because of the attendant circumstances and their impact on the defendant's mental state."]; *Price*, *supra*, 8 Cal.App.5th at p. 428 ["a defendant 'is guilty of voluntary manslaughter in "limited, explicitly defined circumstances"'"].) The mitigating factors in section 192, subdivision (a), however, do not apply to felony murder. (See *Price*, at pp. 429-430 [felony murder "renders irrelevant defenses that mitigate malice such as provocation or self-defense"].) "Voluntary manslaughter thus is not a lesser included offense of felony murder." (*Id.*, at p. 430; see *People v. Turner* (2020) 45 Cal.App.5th 428, 439 ["'neither felony-murder nor the natural and probable consequences doctrine are theories on which one can commit voluntary manslaughter'"].)

Adams argues that "second degree murder and voluntary manslaughter . . . are lesser included offenses to the alleged

crime *as charged*" and that "the accusatory pleading, which gave [him] notice that he was entitled to lesser jury instructions to his first degree murder charge, must govern." As discussed, however, the accusatory pleading does not apply because the second amended information did not allege any additional facts beyond the statutory language of section 187, subdivision (a). And Adams had ample notice of the crime the People intended to prove in the second trial. Adams knew from the moment the jury in his first trial acquitted him of premeditated murder the People could not and would not prosecute him for first degree malice murder in any retrial. Our opinion in *Adams I* made clear felony murder was the only permissible first degree murder theory. (See *People v. Bailey* (2012) 54 Cal.4th 740, 751-752 ["the accusatory pleading test only applies in determining whether a defendant received *notice* of the charges against him in order to have a reasonable opportunity to prepare and present his defense" and "is not applicable" where "concerns about notice are not at issue"]; *Huynh*, *supra*, 212 Cal.App.4th at pp. 312-313 ["Notwithstanding the reference to section 187 in the information, the prosecution's case was tried strictly on a first degree felony-murder theory," and the defendant "knew from the get-go that his case was being prosecuted only on a felony-murder theory."].)[10]

   *People v. Anderson* (2006) 141 Cal.App.4th 430, on which Adams principally relies, is distinguishable. In that case the

---

[10]   Adams asserts *Huynh*, *supra*, 212 Cal.App.4th 285 is distinguishable because there "the prosecution's case was tried strictly on a first degree felony-murder theory—which was not the case here." The record refutes this assertion. On the first

35

accusatory pleading charged malice murder, and after the close of evidence at trial, the charge of felony murder "was 'added' to the information." (*Id.* at p. 445.) The court in *Anderson* concluded: "Having established the expectation that instruction on lesser included offenses of murder would be given, if supported by the evidence, the prosecution could not defeat that expectation by amendment after the close of evidence." (*Id.* at p. 446.) Unlike the defendant in *Anderson*, Adams could not have reasonably expected the trial court to instruct on lesser included offenses of a crime the prosecution could not and did not pursue. The prosecution here was not adding a felony murder count to the charging document to defeat any expectation by Adams that the court would give instructions on lesser included offenses of malice murder. Instead, the prosecution was correcting the charging document to conform with what everyone already knew: The prosecution was proceeding on a theory of felony murder, not malice murder. Adams had no expectation the court would give

---

degree murder count, the People proceeded only on a theory of felony murder. While the People also charged Adams in a separate count with second degree murder, the court gave an instruction on a lesser included offense in connection with that count.

instructions on malice murder or its lesser included offenses on the first degree felony murder count.

      D.     *Any Misstatement of Law by the Prosecutor in Closing Argument Did Not Prejudice Adams*

      1.     *Relevant Proceedings*

Before opening statements, and again before closing arguments, the trial court gave CALCRIM No. 220, which instructed the jury on the presumption of innocence and the burden of proof: "A defendant in a criminal case is presumed to be innocent. This presumption requires that the People prove a defendant guilty beyond a reasonable doubt. Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt. Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true. The evidence need not eliminate all possible doubt, because everything in life is open to some possible or imaginary doubt. In deciding whether the People have proved their case beyond a reasonable doubt, you must impartially compare and consider all the evidence that was received throughout the entire trial. Unless the evidence proves the defendant guilty beyond a reasonable doubt, he is entitled to an acquittal, and you must find him not guilty." The court also instructed the jurors that they "must follow the law" as the court explained it, even if they disagreed with it, and that, if they believed the attorneys' comments about the law conflicted with the court's instructions, they had to follow the court's instructions.

The prosecutor began his closing argument with a review of the facts of the case and proceeded to discuss the applicable law.

Among other things, the prosecutor stated:  "You've heard this phrase 'beyond a reasonable doubt' from the very first day you were here . . . all the way up until . . . 20 minutes ago when the judge was reading you the jury instructions.  What is this?  What does it mean?  Well, beyond a reasonable doubt is what they call the standard of proof.  It means this is how sure you have to be before you can vote guilty.  This is how sure you have to be, beyond a reasonable doubt."  The prosecutor quoted and discussed the jury instructions.  The prosecutor stated that "abiding conviction" meant the jurors "are convinced . . . it happened this way" and that, if someone asked a juror in a week, a month, a year, or five years later whether he or she made the right decision, the juror would say, "Yeah, I made the right decision.  I am comfortable that I made the right decision."

The prosecutor described standards that "are higher than beyond a reasonable doubt," such as "beyond a shadow of a doubt" or "100 percent sure," which, the prosecutor said, the law did not require.  The prosecutor stated (and this is the basis of Adams's prosecutorial misconduct argument):  "Another way to think of that is kind of, you are convinced beyond a reasonable doubt if you think the only reasonable explanation is that [Adams is] guilty.  That fits all the facts that you heard.  The only reasonable explanation that fits all the facts you heard is that he's guilty.  If that's what you think, you are convinced beyond a reasonable doubt."  Counsel for Adams did not object to these

statements or request an admonition, and the prosecutor moved on to discuss the charges in the case.

### 2. *Applicable Law*

"Advocates are given significant leeway in discussing the legal and factual merits of a case during argument. [Citation.] However, 'it is improper for the prosecutor to misstate the law generally [citation], and particularly to attempt to absolve the prosecution from its . . . obligation to overcome reasonable doubt on all elements.'" (*People v. Centeno* (2014) 60 Cal.4th 659, 666 (*Centeno*); accord, *People v. Medellin* (2020) 45 Cal.App.5th 519, 532-533.) "'The case law is replete with innovative but ill-fated attempts to explain the reasonable doubt standard.'" (*People v. Bell* (2019) 7 Cal.5th 70, 111.) The Supreme Court has "stopped short, however, of categorically disapproving the use of reasonable doubt analogies or diagrams in argument," and instead directed reviewing courts to "assess each claim of error on a case-by-case basis." (*Centeno*, at p. 667.) A defendant asserting prosecutorial misconduct must "'establish a reasonable likelihood the jury construed the remarks in an objectionable fashion.'" (*People v. Potts* (2019) 6 Cal.5th 1012, 1036 (*Potts*); see *Bell*, at p. 111.) "'In conducting this inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.'" (*People v. Ramirez* (2022) 13 Cal.5th 997, 1129.)

"'A claim of prosecutorial misconduct is ordinarily preserved for appeal only if the defendant made "a timely and specific objection at trial" and requested an admonition.' [Citations.] . . . These failures could be excused if an objection would have been futile or a request for admonition ineffectual."

(*Potts*, *supra*, 6 Cal.5th at p. 1035; see *People v. Johnsen* (2021) 10 Cal.5th 1116, 1164-1165 (*Johnsen*).)

### 3. *Adams's Prosecutorial Misconduct Argument Fails*

Adams did not preserve his contention the prosecutor committed misconduct. Counsel for Adams neither objected to the prosecutor's argument nor requested an admonition, and nothing in the record suggests those actions would have been futile or ineffectual. (*Johnsen*, *supra*, 10 Cal.5th at p. 1165; *Potts*, *supra*, 6 Cal.5th at p. 1035; see *Centeno*, *supra*, 60 Cal.4th at p. 674 ["A prosecutor's misstatements of law are generally curable by an admonition from the court."].)[11]

---

[11] Adams asserts his trial counsel rendered ineffective assistance by failing to object to the prosecutor's "misstatement of the reasonable doubt standard" that "was inconsistent with CALCRIM No. 220 and section 1096." Adams, however, cannot show he received ineffective assistance under *Strickland v. Washington* (1984) 466 U.S. 668 because he cannot demonstrate prejudice. (See *Johnsen*, 10 Cal.5th at p. 1168 [court's correct instructions "mitigated any misimpression the prosecutor's misstatements of the reasonable doubt standard would have given [and] reduced any risk the jury would be misled by defense counsel's similar misstatements"]; *People v. Ramirez* (2022) 79 Cal.App.5th 48, 62 ["even assuming deficient performance, defendant was not prejudiced by the failure to object to the prosecution's argument" because the court properly instructed the jury on the burden of proof], review granted August 17, 2022, S275341.) Contrary to Adams's characterization of the evidence ("quite slim"), as discussed there was substantial evidence Adams had the specific intent to maim Briggs.

Even if Adams had not forfeited the argument, he has not shown a reasonable probability the jury misconstrued the prosecutor's statements. To be sure, the prosecutor's attempt to explain the reasonable doubt standard was not a good idea. Stating that another way to think of the reasonable doubt standard was to consider whether "the only reasonable explanation is that [Adams] is guilty" was not an entirely accurate statement of the law. (See *Centeno, supra,* 60 Cal.4th at p. 675 ["the prosecutor's argument urging the jury to convict based on a reasonable account of the evidence misstated the burden of proof"]; but see *People v. Roberts* (2021) 65 Cal.App.5th 469, 482, fn. 1 [prosecutor did not commit misconduct by "describing the reasonable doubt standard as if the 'evidence points to a reasonable conclusion that [the defendant] is guilty beyond any reasonable doubt, then he's guilty'"]; *People v. Cowan* (2017) 8 Cal.App.5th 1152, 1162 [prosecutor's explanation that "beyond a reasonable doubt means 'you're firmly convince[d] that guilt is the only reasonable interpretation of the evidence'" was "an accurate statement of the meaning of beyond a reasonable doubt"].)

The prosecutor's misstatement, however, was brief and isolated, and the trial court twice correctly defined the reasonable doubt standard and instructed the jury to follow the court's instructions if anything the attorneys said conflicted with its instructions on the law. In addition, before the prosecutor's comment on the beyond-a-reasonable-doubt standard, he recited the correct definition of reasonable doubt (using the court's instruction), and the jurors had a written copy of the correct definition during deliberations. And after the prosecutor's remark, he did not discuss the reasonable doubt standard again

41

or apply his rephrasing of the standard to the evidence, as the prosecutor did in *Centeno*, *supra*, 60 Cal.4th at pages 671-672. "[W]e presume not only that jurors follow instructions in general [citation], but also 'that jurors treat the court's instructions as a statement of the law by a judge, and the prosecutor's comments as words spoken by an advocate in an attempt to persuade.'" (*Potts*, *supra*, 6 Cal.5th at p. 1037; see *People v. Cortez* (2016) 63 Cal.4th 101, 131-132 ["'argument should "not be judged as having the same force as an instruction from the court"'"].) Under these circumstances, it was not reasonably probable the jurors misunderstood the prosecutor's comment about the reasonable doubt standard. (See *Johnsen*, *supra*, 10 Cal.5th at p. 1167 ["it was not reasonably likely that the prosecutor's misstatements caused one or more jurors to convict [the defendant] on a standard lower than beyond a reasonable doubt" because the court "provided the jury with correct instructions on reasonable doubt and directed the jury to follow these instructions in the event of any conflicting statements"]; *Potts, supra*, 6 Cal.5th at pp. 1037-1038 [where the prosecutor's challenged remarks were brief and referred to the court's instructions, and the court correctly instructed the jury and gave each juror a copy of the instructions, it was "not reasonably likely the jury construed the remarks in an objectionable fashion, nor that 'the jury understood the instructions to allow conviction based on' inadequate proof"]; *Cortez*, *supra*, 63 Cal.4th at pp. 133-134 ["no reasonable likelihood" the jury misconstrued or misapplied the prosecutor's challenged remarks, where the comments "were brief and constituted a tiny, isolated part of the prosecution's argument," the prosecutor referred to the jury

instruction on the topic, and the court properly defined "'reasonable doubt'" in its oral and the written instructions].)[12]

Adams argues the prosecutor's statement "that the jury must convict if it finds guilt is the only *reasonable* interpretation to be gleaned *from the evidence that was presented*" implied "the jury need not also consider whether *that very evidence was sufficient enough in the first place* to provide proof beyond a reasonable doubt." The prosecutor's statement made no such implication, particularly given that, moments before the challenged remark, the prosecutor properly explained "abiding conviction" and told the jurors they could not convict unless they found the evidence left them with the long-lasting conviction that "it happened this way." (See § 1096 [reasonable doubt "is that state of the case, which, after the entire comparison and consideration of all the evidence, leaves the minds of jurors in that condition that they cannot say they feel an abiding conviction of the truth of the charge"].)

---

[12] "Error with respect to prosecutorial misconduct is evaluated under [*Chapman v. California* (1967) 386 U.S. 18], to the extent federal constitutional rights are implicated, and under [*People v. Watson* (1956) 46 Cal.2d 818] "if only state law issues were involved. [Citation.] *Chapman* is implicated if the prosecutor's conduct renders the trial so fundamentally unfair that due process is violated. [Citations.] *Watson* applies where the prosecutor uses deceptive or reprehensible methods to attempt to persuade either the court or the jury." (*People v. Clark* (2021) 62 Cal.App.5th 939, 972, internal quotation marks omitted.)

E. *There Was No Cumulative Prejudice*

Finally, Adams contends that the "cumulative effect" of the errors he argues the trial court committed "undermined confidence in the integrity of the trial, rendered the trial fundamentally unfair, and deprived [him] of his constitutional right to due process." Not here. "In theory, the aggregate prejudice from several different errors occurring at trial could require reversal even if no single error was prejudicial by itself. '[A] series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error.'" (*In re Reno* (2012) 55 Cal.4th 428, 483; accord, *People v. Kocontes* (2022) 86 Cal.App.5th 787, 891-892; *People v. Sorden* (2021) 65 Cal.App.5th 582, 618.) "'The "litmus test" for cumulative error "is whether defendant received due process and a fair trial."'" (*People v. Thomas* (2021) 64 Cal.App.5th 924, 971.)

The (at most) two errors in Adams's retrial (the trial court's use of aggravated mayhem instead of simple mayhem as the underlying felony for the felony murder instruction and the prosecutor's arguable misstatement of the reasonable doubt standard) did not cumulate to deprive Adams of a fair trial. As discussed, the jury's finding Adams had the specific intent to commit aggravated mayhem encompassed a finding Adams had the specific intent to commit simple mayhem. Therefore, that instructional error did not result in any prejudice to Adams. And, as discussed, in light of the trial court's proper instructions on the reasonable doubt standard, there was no reasonable probability the jury misunderstood the prosecutor's misstatement. The one-and-a-half to two errors in this case do not justify reversal. (See *People v. Seumanu* (2015) 61 Cal.4th

44

1293, 1365 ["no cumulative prejudice requiring reversal" where the prosecutor's misstatements "were . . . not prejudicial in light of the strong evidence of guilt and the instruction informing the jury that the arguments of counsel are not evidence"]; *People v. Sta Ana*, *supra*, 73 Cal.App.5th at p. 64 [because there was "only one error," the "defendant's cumulative prejudice argument must fail"].)

## DISPOSITION

The judgment is affirmed.


SEGAL, J.

We concur:


PERLUSS, P. J.


FEUER, J.